ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br>Apelado<br><br>v.<br><br>ROBERTO LUIS MONTALVO IRIZARRY<br>Apelante | KLAN202300983 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Ponce<br><br>Caso Número: JVI2019G0011 al 12 JLA2019G0122 al 0124<br><br>Sobre: Art. 93 (A)<br><br>C. P. y Otros |
| --- | --- | --- |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Rivera Marchand y la Jueza Aldebol Mora[1]

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de noviembre de 2025.

Comparece ante nos el señor Roberto Luis Montalvo Irizarry (apelante o señor Montalvo Irizarry) y solicita que revoquemos la *Sentencia* que dictó el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI o foro primario), el 10 de octubre de 2023. Mediante juicio por jurado, el apelante fue hallado culpable de violaciones al Artículo 93 (A) (asesinato en primer grado) y la tentativa del Artículo 93 (A) del Código Penal de Puerto Rico, Ley Núm. 146-2012 (Código Penal), 33 LPRA sec. 5142. También, se le halló culpable por una violación al Artículo 5.04 (portación y uso de armas de fuego sin licencia) y dos infracciones al Artículo 5.15 (disparar o apuntar armas) de la derogada *Ley de Armas de Puerto Rico*, Ley Núm. 404-2000, 25 LPRA secs. 458c y 458n, respectivamente.[2] Además, el

_____

[1] Mediante Orden Administrativa OATA-2023-211, emitida el 6 de diciembre de 2023, se modificó la integración del Panel, conforme la Orden Administrativa OAJP-2021-086.
[2] Por tratarse de hechos ocurridos con anterioridad a la aprobación y vigencia de la *Ley de Armas de Puerto Rico de 2020* (Ley Núm. 168 de 11 de diciembre de 2019), nos limitaremos a discutir las disposiciones aplicables y correspondientes a la Ley de Armas de Puerto Rico del 2000.

jurado lo halló culpable por una infracción al Artículo 279 (desacato) del Código Penal de Puerto Rico, 33 LPRA sec. 5372.

Por los fundamentos que exponemos a continuación, confirmamos la *Sentencia* apelada.

**I.**

Por hechos ocurridos, el 18 de mayo de 2019, el Ministerio Público presentó acusaciones en contra del señor Montalvo Irizarry por los siguientes delitos: asesinato en primer grado de Carlos Isaac Sánchez Plaza (el occiso); tentativa de asesinato en contra de Edwin Marcucci Soto (señor Marcucci); portación y uso de un arma de fuego sin licencia; y dos (2) cargos por disparar o apuntar armas de fuego en contra del occiso y del señor Marcucci.

El juicio fue celebrado ante un jurado los días 3, 4, 7, 9, 11, 14, 16, 17, 23, 24, 28, 29, 30 y 31 de marzo de 2022; 1 y 4 de abril de 2022; 27 de mayo de 2022; 30 de junio de 2022; 10 de noviembre de 2022; 7, 8 y 14 de diciembre de 2022; 15 de febrero de 2023; 31 de julio de 2023; 3, 7 y 8 de agosto de 2023. Durante el juicio, el Ministerio Público presentó treinta y dos (32) testigos de cargo, así como prueba documental.[3]

---

[3]El Ministerio Público presentó los siguientes Exhibits: (1) Hoja de identificación y foto del cuerpo del occiso; (2) CDR con fotos de la escena tomadas por la agente Caraballo; (3) CDR con fotos de la escena tomadas por la agente Caraballo; (4) PPR-70 – Solicitud para estudio e identificación de huellas dactilares; (5) PPR-655 – Tarjeta de récord de levantamiento de huellas latentes; (6) Hoja de incidente 2019-05-18:199:3920; (7) Hoja de incidente 2019-05-18:99:4207; (8) CDR del 911 72-08 sobre situación sospechosa en Ponce; (9) Hoja de incidente 2019-05-18:199:4195; (10) Certificación de duplicado de grabación de llamada al 911; (11) Foto del apelante; (12) *Line up* fotográfico; (13) Acta sobre confrontación fotográfica; (14) Sobre DVD R STG-3-19-353; (15) CD SAR-19-0166 de vehículos hurtados; (16) Sección de análisis y reconstrucción SAR-19-0166; (17) Dibujo hecho por el testigo Edwin Marcucci Soto; (18) Resultado de Análisis de Huellas Dactilares de la División de Identificación Criminal, Sección Monodactilar; (19) Sobre DNAS-19-0592; (20) Sobre DNAS-19-1179; (21) Colector bucal DNAS-19-0592; (22) Hisopo del vehículo DNAS-19-1179; (23) Certificado de análisis forense de ADN; (24) Solicitud de análisis SAR-19-0166; (25) Cadena de custodia; (26) ED-19-0055 sobre evidencia celular; (27) Celular gris; (28) Solicitud de servicio forense ED-19-0055; (29) Continuación de cadena de custodia de evidencia ED-19-0055; (30) DVD R ED-19-0055 del ICF; (31) Certificado de análisis forense ED-19-0055; (32) Pistola Springfield Armory, calibre .45, color gris y verde; (33) Magazín; (34) Sobre amarillo dentro plástico transparente con proyectiles y número AF-19-0605; (35) Sobre amarillo dentro de plástico transparente sellado con casquillos de bala; (36) Sobre amarillo dentro de plástico transparente sellado con bala sin disparar; (37) Plástico transparente sellado con proyectil y sus derivados en su interior, número AF-19-0605; (38) Solicitud de servicios forenses AF-19-0605; (39) Continuación de cadena de custodia AF-19-0605; (40) Solicitud de análisis sección de patología P-19-0222; (41) Continuación cadena de custodia

A continuación, procedemos a resumir los aspectos relevantes de la prueba testimonial.

**Charlie Isaac Sánchez Plaza**

El Sr. Charlie Isaac Sánchez Plaza testificó ser el hermano del occiso.[4] Indicó que, en la madrugada del 19 de mayo de 2019, recibió una llamada de su otro hermano, Isaac, quien lo alertó de que el occiso había tenido un percance y se desconocía si estaba vivo o muerto.[5] A preguntas del Ministerio Público sobre qué hizo luego de esa llamada, relató que, se dirigió hacia la casa de sus padres.[6] Narró que, dos de sus hermanos procedieron a enseñarle una noticia desde el celular de ellos y, en ella, identificó que el carro era de Marcucci, a quien describió como un amigo del occiso.[7] Informó conocer a Marcucci, y se refirió a él como "Macu."[8] Sostuvo que, como la residencia de Marcucci estaba localizada en la misma urbanización que la de sus padres, fue a la casa de Macu pero el carro no estaba, y no había nadie.[9]

Inquirido sobre qué hizo después, atestó haberse dirigido al lugar donde decía la noticia, en la Urbanización Las Delicias en Ponce.[10] Añadió que, luego de hablar con alguien desconocido que paseaba unos perros en el área, se dirigió al Cuartel más cercano para obtener información sobre su hermano.[11] Sostuvo que, en el

---

P-19-0222; (42) Solicitud de servicios forenses DNAS-19-0592; (43) Continuación de cadena de custodia DNAS-19-0592; (44) Solicitud de servicio forense DNAS-19-1179; (45) Continuación de cadena de custodia de evidencia DNAS-19-1179; (46) Caja AF-19-0605, arma de fuego, proyectiles y casquillos; (47) Sobre de evidencia P-19-0222; (48) Solicitud de análisis Sección de Patología MBP-19-0274; (49) Recibo de entrega de evidencia del 15/11/2019; (50) Recibo de entrega de evidencia del 5/02/2020; (51) Certificación expedida por el Tnte. Ferreira sobre licencia de armas; (52) Informe médico forense PAT-1942-19; (53) DVD R PAT-1942-19; (54) CD fotos PAT-1942-19, color amarillo y guardado en sobre amarillo; (55) Certificado de examen AF-19-0605, Sección Armas de Fuego; y (56) Copia de orden de arresto diligenciada.

[4] Transcripción de la prueba oral de las vistas celebradas, desde el 3 de marzo de 2022 hasta el 7 de agosto de 2023 (TPO), pág. 15, líneas 28-30; pág. 16, líneas 1-2.

[5] *Íd.*, pág. 16, líneas 13-23.

[6] *Íd.*, pág. 16, líneas 25-27.

[7] *Íd.*, pág. 17, líneas 5-12.

[8] *Íd.*, pág. 17, líneas 21-24.

[9] *Íd.*, pág. 17, líneas 26-30.

[10] *Íd.*, pág. 18, líneas 1-7.

[11] *Íd.*, pág. 18, líneas 13-30; pág. 19, líneas 1-4.

cuartel, le indicó a un oficial que estaba buscando a su hermano y el oficial lo dirigió a la Comandancia de Ponce.[12] Añadió que, en la Comandancia, el Agente Meléndez le dijo que su hermano había sido asesinado.[13] Declaró haberle informado al Agente Meléndez que, cuatro o cinco días antes del suceso, el occiso le comentó que iba a ganar $200 a cambio de entregar ocho (8) libras de marihuana en Ponce.[14] Aseguró no conocer al Sr. Roberto Montalvo Irizarry, conocido por Bebo.[15] Expresó haber identificado al occiso en el Instituto de Ciencias Forenses (ICF).[16]

Durante el contrainterrogatorio, Charlie Isaac Sánchez Plaza se reafirmó en que conocía a Marcucci.[17] Expresó haber ofrecido características específicas y haber mostrado fotos del occiso previo a que el Agente Meléndez le diera información sobre su hermano y confirmara su fallecimiento.[18] A preguntas de la defensa, relató que el occiso no estaba seguro si iría solo o con quién bajaría a Ponce a realizar la venta de sustancias controladas.[19]

### **Agente Nilza Caraballo**

La Agente Caraballo declaró que, labora como Agente de Servicios Técnicos del Cuerpo de Investigaciones Criminales (CIC) de Ponce, adscrito a la Policía de Puerto Rico.[20] Explicó que entre sus funciones está, llegar a la escena de un crimen, realizar búsquedas de evidencia, tomar fotos y levantar huellas dactilares y/o ADN.[21] La Agente Caraballo detalló que, el 18 de mayo de 2019, llegó a la escena, frente a la entrada de la Urbanización Las Delicias en Ponce, alrededor de las 11:00 pm, tras recibir la llamada de que allí había una persona muerta dentro de un vehículo.[22] Añadió que,

---

[12] *Íd.*, pág. 19, líneas 7-10.
[13] *Íd.*, pág. 19, líneas 9-20.
[14] *Íd.*, pág. 19, líneas 21-26.
[15] *Íd.*, pág. 19, líneas 14-16.
[16] *Íd.*, pág. 20, líneas 17-21.
[17] *Íd.*, pág. 22, líneas 22-26.
[18] *Íd.*, pág. 24, líneas 12-22.
[19] *Íd.,* pág. 25, línea 7-16.
[20] *Íd.*, pág. 30, líneas 4-6.
[21] *Íd.*, pág. 30, líneas 17-20.
[22] *Íd.*, pág. 30, líneas 27-30; pág. 31, líneas 1-5.

al llegar al lugar, vio un vehículo Toyota Corolla, color vino, con tablilla IEJ164, en cuyo interior estaba el cuerpo sin vida de un hombre.[23]

Narró que fue la encargada de tomar las fotos de la escena del crimen, levantar la evidencia y embalarla.[24] Asimismo, que entre la evidencia encontrada, dentro y alrededor del vehículo, ocuparon dos casquillos de bala en el piso, cerca de la puerta trasera derecha del carro, y un casquillo en la butaca posterior del lado derecho.[25] Igualmente, testificó que observó un proyectil de bala en el suelo, cerca de las piernas del occiso, y otro localizado frente a este, en el área del *dash* del vehículo.[26] Declaró que, vio impactos de bala en el cristal delantero y que el espejo del retrovisor del lado del conductor tenía un impacto de bala y estaba roto con los espejos en el piso.[27] Describió el lugar de la escena como bien alumbrado.[28] Añadió que, realizó un levantamiento de huellas dactilares con cinta adhesiva para ser analizadas.[29]

Entre las distintas fotos que le mostró el Ministerio Público, destacamos la identificada con el número 7754, sobre la cual describió ver un impacto de bala en el cristal frontal derecho, con trayectoria de adentro hacia afuera; el retrovisor del lado del conductor estaba roto y el espejo tirado en el piso; y dentro del vehículo, el cuerpo sin vida de un caballero.[30] Con respecto a la foto número 7778, la Agente Caraballo relató que, observó que el occiso tenía su cabeza echada hacia atrás, que su camisa estaba manchada con sangre y que sus manos estaban entre medio de sus piernas, donde también tenía un arma de fuego y un celular.[31]

---

[23] *Íd.*, pág. 31, líneas 6-9.
[24] *Íd.*, pág. 32, líneas 6-10; pág. 33, líneas 15-17.
[25] *Íd.*, pág. 32, líneas 13-18.
[26] *Íd.*, pág. 33, líneas 1-6.
[27] *Íd.*, pág. 33, líneas 10-14.
[28] *Íd.*, pág. 37, líneas 27-29.
[29] *Íd.*, pág. 38, líneas 27-30.
[30] *Íd.*, pág. 41, líneas 2-22.
[31] *Íd.*, pág. 45, líneas 10-18.

Agregó que, en el *dash* frente al fallecido, había un impacto de bala incrustado.[32] Sobre el arma de fuego que tenía el occiso entre sus piernas, abundó que era una pistola Springfield Armory WS 774125, cargado con diez (10) municiones.[33] La Agente Caraballo pudo identificar que el referido celular tenía una foto del occiso como fondo de pantalla.[34]

Al extraer el cuerpo del occiso del automóvil, la Agente Caraballo tomó una foto a todo el cuerpo y observó que, tenía heridas de bala en el lado izquierdo de la nariz, en el antebrazo derecho, en el lado derecho del abdomen, en la palma de la mano izquierda, en la parte posterior de su cabeza y en la espalda.[35] Añadió que, en el vehículo halló una cartera con documentos a nombre de Edwin Marcucci Soto.[36]

Luego de trabajar la escena relató que, el mismo 19 de mayo de 2019, fue a la sala de emergencias del Hospital San Lucas en Ponce, en donde vio y fotografió al señor Marcucci.[37] Atestó que, el señor Marcucci tenía dos heridas de bala en el área del hombro.[38]

A preguntas del Ministerio Público, expresó que, la evidencia levantada en la escena fue embalada y la guardó bajo llave en su escritorio hasta el 24 de mayo de 2019, cuando se la entregó al ICF, para el análisis correspondiente.[39] Declaró que, entre la evidencia entregada al ICF, estuvo un colector bucal tomado al Sr. Roberto Montalvo Irizarry, el 12 de noviembre de 2019.[40] Añadió haber levantado huellas en el exterior del Toyota Corolla hallado en la escena, las cuales entregó al Agente Miguel Quiñones para su análisis.[41]

---

[32] *Íd.*, pág. 46, líneas 23-28.
[33] *Íd.*, pág. 49, líneas 22-25; pág. 50, líneas 5-7.
[34] *Íd.*, pág. 51, línea 6.
[35] *Íd.*, pág. 51, líneas 11-30; pág. 53, líneas 9-14; pág. 54, líneas 16-18; pág. 56, líneas 1-11.
[36] *Íd.*, pág. 57, líneas 1-7.
[37] *Íd.*, pág. 57, líneas 13-18.
[38] *Íd.*, pág. 57, líneas 29-30; pág. 58, líneas 1-3.
[39] *Íd.*, pág. 62, líneas 18-24.
[40] *Íd.*, pág. 74, líneas 19-22.
[41] *Íd.*, pág. 84, líneas 1-15.

Durante el contrainterrogatorio, la Agente Caraballo atestó que el hisopo levantado en el vehículo fue para propósitos de comparar el ADN.[42] Aclaró que, en la puerta derecha del vehículo se levantaron huellas -por dentro y por fuera-, a petición del Agente Francisco Meléndez de la división de homicidios, pero en términos del ADN, lo trabajaron únicamente por adentro.[43]

### Evelyn Medina Conde

La señora Medina Conde declaró que, trabaja como oficinista y administradora de documentos para el Negociado del Sistema de Servicios de Emergencias 911 (Sistema 911), a cargo de la custodia, validación y manejo de los documentos.[44] La señora Medina Conde atestó haber corroborado que el disco compacto (CD) con las grabaciones recibidas en el Sistema 911, el 18 de mayo de 2019, en Ponce, alrededor de las 10:22 pm, relacionadas al evento en cuestión, es una copia fiel y exacta de las llamadas registradas en la computadora del Sistema 911 y acorde con la solicitud de *subpoena* recibida.[45]

### Ricardo Luis Calderón Fradero y Rigo Aponte

Ambos declararon en calidad de telecomunicadores del Sistema 911 a los efectos de que atendieron dos (2) de las tres (3) llamadas recibidas en el Sistema 911, relacionadas a una situación sospechosa sobre una persona dentro de un automóvil Toyota Corolla color vino.[46]

---

[42] *Íd.*, pág. 88, líneas 21-24.

[43] *Íd.*, pág. 89, líneas 22-27; pág. 90, líneas 5-13.

[44] *Íd.*, pág. 95, líneas 22-28.

[45] *Íd.*, pág. 96, líneas 16-29; pág. 97, líneas 1-16 y 22-25.

[46] *Íd.*, pág. 103, líneas 1-3; pág. 110, líneas 6-9; pág. 111, líneas 24-26; pág. 117, líneas 2-12. La tercera llamada la atendió **Gerardo Tapia** quien, de haber estado disponible para declarar durante el juicio, hubiese testificado lo mismo que Ricardo Luis Calderón Fradero y Rigo Aponte. Por razones de salud, tampoco testificó **Elmer Torres**, quien preparó el CD, marcado como Exhibit 10, que contiene las tres (3) llamadas recibidas al Sistema 911. *Íd.*, pág. 118, líneas 18-30 y pág. 119, líneas 1-3.

**Agente Erick Ortiz**

El Agente Ortiz informó que es Policía Municipal en Ponce.[47] Narró que, el 18 de mayo de 2019, se encontraba en su casa en la Urbanización Las Delicias en Ponce, cuando un caballero entró a la sala de su hogar, sin invitación, aproximadamente a las 10:20 pm.[48] El Agente detalló que empujó al individuo fuera de su casa, pero este le pidió auxilio porque estaba herido de bala.[49] Agregó que le indicó al herido que se tirara al piso para llamar a una ambulancia por si lo vienen siguiendo, pero que el individuo lo miró y se fue corriendo cuesta arriba por la Calle Héctor Ortiz de la Renta.[50] Tras este incidente declaró que, buscó su arma de reglamento y llamó al Centro de Mando Municipal para reportar la situación.[51]

Agregó que, luego de perder de vista al herido mientras lo perseguía, llegaron varias unidades de la uniformada y se les acercó un caballero quien les manifestó que era residente de la urbanización y que el herido estaba en su casa.[52] El Agente Ortiz identificó una foto de Edwin Marcucci Soto como la persona herida de bala que llegó a su casa.[53]

**Jaime Pagán Torres**

El Sr. Pagán Torres indicó que, para el 18 de mayo de 2019, residía en la Calle Vivas Valdivieso de la Urbanización Las Delicias en Ponce.[54] Narró que, esa noche, dejó el portón eléctrico de su marquesina abierto y un hombre entró.[55] Relató que, el hombre le indicó que estaba herido de bala y le pidió ayuda.[56] Declaró que, accedió a ayudar al herido con la condición de que este saliera de

---

[47] *Íd.*, pág. 120, líneas 26-27.
[48] *Íd.*, pág. 120, líneas 28-30; pág. 121, líneas 5-8.
[49] *Íd.*, pág. 121, líneas 12-15.
[50] *Íd.*, pág. 122, líneas 3-7.
[51] *Íd.*, pág. 123, líneas 8-10.
[52] *Íd.*, pág. 123, líneas 18-22; pág. 124, líneas 1-4.
[53] *Íd.*, pág. 129, líneas 4-9.
[54] *Íd.*, pág. 133, líneas 12-15.
[55] *Íd.*, pág. 135, líneas 7-23.
[56] *Íd.*, pág. 136, líneas 10-21.

su hogar, lo cual hizo, se sentó en la acera y le pidió un celular para llamar a su esposa, con quien habló brevemente sobre lo sucedido.[57]

A preguntas del Ministerio Público manifestó que, escuchó una sirena y que le dio el alto a 4 ó 5 patrullas municipales a quienes les informó que una persona herida estaba frente a su casa para que lo asistieran.[58] Agregó haber escuchado al herido expresar a los agentes que había un occiso en su vehículo.[59] El señor Pagán Torres indicó que el apellido del herido de bala era Marcucci,[60] a quien identificó a través de una fotografía.[61]

Durante el contrainterrogatorio, testificó que, cuando le dijo al señor Marcucci que llamaría a la policía, este no se opuso y le manifestó no tener problemas con nadie.[62]

### Teniente Pedro Sánchez Vázquez

Declaró que labora como Teniente de la Policía Municipal de Ponce.[63] Indicó que, la noche del 18 de mayo de 2019, se encontraba realizando un patrullaje preventivo en el casco urbano con su compañero, Rafael Mercado.[64] Narró que, alrededor de las 10:45 pm, el operador del Centro de Mando informó que, a la residencia del Agente Ortiz, llegó un hombre herido de bala.[65]

Relató que, en dirección hacia la residencia del Agente Ortiz, se encontraron con una escena que aparentaba ser un accidente de auto, en la entrada de la Urbanización Las Delicias.[66] Narró que, cuando llegaron a la casa del Agente Ortiz, este les indicó que el herido se había marchado del lugar.[67] El Teniente Sánchez Vázquez detalló que, se les acercó un caballero, quien se identificó como

---

[57] *Íd.,* pág. 136, líneas 18-26; pág. 137, líneas 3-4 y 18.
[58] *Íd.,* pág. 138, líneas 5-11.
[59] *Íd.,* pág. 139, líneas 1-2.
[60] *Íd.,* pág. 139, líneas 28-30; pág. 140, líneas 1-3.
[61] *Íd.,* pág. 141, líneas 19-25.
[62] *Íd.,* pág. 146, líneas 6-17.
[63] *Íd.,* pág. 151, líneas 12-13.
[64] *Íd.,* pág. 151, líneas 17-20.
[65] *Íd.,* pág. 151, líneas 27-29.
[66] *Íd.,* pág. 152, líneas 11-16.
[67] *Íd.,* pág. 154, líneas 18-21.

vecino de la zona, y les informó que el herido de bala estaba frente a su casa.[68]

Continuó declarando que, al llegar al referido lugar, vio sentado en la acera a un individuo de tez blanca, de 25-30 años, que vestía camisa negra y mahón corto, y que sangraba por el hombro derecho.[69] Expresó que, procedió a realizarle preguntas generales al herido, quien les reveló que su nombre era Edwin Marcucci.[70] Narró además que, el señor Marcucci le expresó que, uno de los pasajeros con quienes viajaba en su vehículo le había disparado al pasajero delantero.[71]

Detalló que, continuó entrevistando al señor Marcucci en la ambulancia, de camino al hospital, quien le expresó que él y el acompañante que iba sentado en el asiento delantero, viajaban desde Mayagüez.[72] Narró que el señor Marcucci le indicó que, durante el viaje, recibió varias llamadas telefónicas y que un individuo, a quien no conocía, pero sabía que le decían "Bebo", le solicitó que lo recogiera cerca de Ponce Cemex porque estaba a pie.[73] El Teniente Sánchez Vázquez agregó que, según le divulgó al señor Marcucci, al recoger a "Bebo" en Ponce Cemex, este se sentó en el asiento posterior del lado derecho, cuando de repente sacó un arma de fuego, le ordenó al señor Marcucci a que botara su teléfono celular y luego le disparó al pasajero frontal.[74] Atestó que, luego de eso, Marcucci le informó que detuvo el carro, abrió la puerta, "se zumbó del vehículo" y se fue corriendo por la avenida que da acceso a la Urbanización Las Delicias, mientras, el individuo a quien le dio pon le disparaba.[75]

---

[68] *Íd.*, pág. 154, líneas 23-29.
[69] *Íd.*, pág. 155, líneas 3-11; pág. 160, líneas 25-26.
[70] *Íd.*, pág. 155, líneas 18-19.
[71] *Íd.*, pág. 155, líneas 20-30.
[72] *Íd.*, pág. 157, líneas 3-6.
[73] *Íd.*, pág. 157, líneas 7-10.
[74] *Íd.*, pág. 157, líneas 9-29.
[75] *Íd.*, pág. 157, línea 30; pág. 158, líneas 1-3.

El Teniente Sánchez Vázquez declaró que, el señor Marcucci le dijo no conocer al individuo a quien le dio pon, sin embargo, sabía que su apodo es Bebo, que estuvo envuelto en unos *carjackings*, que se enfrentó a tiros con la Policía y lo describió como un hombre delgado, trigueño, vestido de negro.[76] El Teniente Sánchez Vázquez agregó que, el señor Marcucci identificó al pasajero delantero como de nombre Carlos Sánchez.[77] Tras el Ministerio Público mostrarle una fotografía, marcada como Exhibit 3, el Teniente Sánchez Vázquez expresó que se trataba de Edwin Marcucci, a quien entrevistó mientras estaba herido de bala el día de los hechos.[78]

A preguntas de la defensa, el Teniente Sánchez Vázquez atestó que, según el señor Marcucci le narraba los hechos, él tomaba notas en su libreta.[79] Aseveró que, el señor Marcucci no le especificó cuándo recibió alguna herida de bala.[80] Detalló que, desde el hospital, se comunicó con el Centro de Mando para canalizar la información que le ofreció al señor Marcucci.[81]

### Agente Javier Colón Maldonado

El Agente Colón Maldonado testificó que, para el 18 de mayo de 2019, laboraba en el Precinto de Ponce, asignado a la investigación de querellas y área preventiva.[82] Relató que, a las 10:30 pm de ese día, recibió una querella -a través del radio de comunicación del Centro de Mando- en la cual informaron que, por el Sistema de Emergencia del 911, se reportó un herido de bala frente a la residencia 2607, en la calle Vivas Valdivieso de la Urbanización Las Delicias.[83]

Atestó que, cuando llegó al referido lugar, se encontró con lo que, a su parecer, era un accidente automovilístico porque observó

---

[76] *Íd.*, pág. 158, líneas 4-14.
[77] *Íd.*, pág. 158, líneas 17-21.
[78] *Íd.*, pág. 163, líneas 10-15.
[79] *Íd.*, pág. 171, líneas 25-30; pág. 172, líneas 1-3.
[80] *Íd.*, pág. 174, líneas 9-10.
[81] *Íd.*, pág. 177, líneas 1-4.
[82] *Íd.*, pág. 193, líneas 19-22 y 29-30; pág. 194, líneas 1-3.
[83] *Íd.*, pág. 194, líneas 4-10.

un vehículo de color vino y una patrulla municipal de Ponce con los biombos encendidos.[84] Añadió que, continuó hacia el lugar en donde estaba el herido de bala, a quien observó con camisa ensangrentada, quejándose de dolor, tocándose el hombro derecho.[85] Detalló que, el herido le narró que venía conduciendo un vehículo Toyota por la Carretera 123; que recibió una llamada de alguien que conocía para que le diera transportación hacia Adjuntas; y que esta persona lo esperaría en Ponce.[86] Indicó que, el herido andaba con un amigo, quien estaba sentado en el asiento de pasajero frontal y que la persona a quien recogió se sentó en la parte posterior.[87] Según le expresó el herido, cuando iban por la Carretera 123, escuchó unas detonaciones que provenían de la parte posterior del vehículo, que se sintió herido de bala, que la persona que estaba a su lado fue herida también, que perdió el control del vehículo y que, cuando logró detenerse, salió del vehículo por el cristal que estaba abajo, corriendo hacia la Calle Vivas Valdivieso para pedir ayuda.[88]

El Agente Colón Maldonado añadió que, mientras el herido, de nombre Edwin Marcucci, relataba lo ocurrido, llegó una ambulancia y lo comenzó a atender.[89] Según narró el Agente Colón Maldonado, el señor Marcucci andaba con un amigo, de nombre Carlos, que conocía por Bebo a la persona a quien le dieron pon.[90] Además relató que, el señor Marcucci le contó que conocía a la persona que les disparó, que lo llamó para que le diera pon, apodado "Bebo", y lo describió como de pelo corto, con barba, flaco, tenía tatuaje y vestido de negro, con *jacket*.[91]

Continuó narrando que, luego de que la ambulancia se llevara al señor Marcucci, se dirigió hacia la escena y allí pudo observar que

---

[84] *Íd.*, pág. 194, líneas 28-30; pág. 195, líneas 1-7.
[85] *Íd.*, pág. 195, líneas 22-29; pág. 196, líneas 1-3.
[86] *Íd.*, pág. 196, líneas 3-9.
[87] *Íd.*, pág. 196, líneas 10-12.
[88] *Íd.*, pág. 196, líneas 13-21.
[89] *Íd.*, pág. 197, líneas 3-6.
[90] *Íd.*, pág. 197, líneas 9-11.
[91] *Íd.*, pág. 197, líneas 10-14, 24-26.

el referido carro era un Toyota Corolla, color vino, de 4 puertas, y que dentro del vehículo había una persona con una camiseta verde de rayas, pantalón negro, sentada en el asiento del pasajero derecho con un impacto de bala en la cabeza.[92] Añadió haber visto un orificio en el retrovisor del lado de conductor, el cual aparentaba ser un impacto de bala.[93]

A preguntas de la defensa, el Agente Colón Maldonado dijo desconocer si él fue quien primero entrevistó al señor Marcucci porque al lugar ya habían llegado unos policías municipales y no sabe lo que estos hicieron.[94] Expresó no haber prestado una declaración jurada sobre lo investigado y aseveró haber tomado notas de lo que el señor Marcucci le manifestó.[95]

### Agente Francisco J. Meléndez Álvarez

El Agente Meléndez Álvarez se identificó como un agente investigador de la División de Homicidios.[96] El testigo relató que el 18 de mayo de 2019 a las 10:30 pm estaba en el turno *on call*, cuando recibió una llamada de su supervisor, el Sargento Miguel Torres Reyes, para que se incorporara porque hubo un asesinato en la carretera 123 de Ponce, por la entrada de la Urbanización Las Delicias, y había una persona herida de bala en el Hospital San Lucas.[97] Expresó que, a su llegada a la escena a las 11:50 pm, observó un Toyota vino de cuatro (4) puertas encendido; en su interior, un joven sentado en el asiento pasajero delantero que tenía la cabeza echada hacia atrás, que vestía un pantalón deportivo largo, una camisa verde esmeralda y gris, manchada, con perforaciones de proyectiles y que estaba muerto.[98] Atestó que, el occiso tenía lo que aparentaba ser un arma de fuego debajo de sus

---

[92] *Íd.*, pág. 198, líneas 10-17.
[93] *Íd.*, pág. 198, líneas 17-19.
[94] *Íd.*, pág. 204, líneas 21-24.
[95] *Íd.*, pág. 207, líneas 13-22.
[96] *Íd.*, pág. 212, líneas 10-11.
[97] *Íd.*, pág. 212, líneas 22-29; pág. 213, líneas 1-5.
[98] *Íd.*, pág. 213, líneas 24-30; pág. 214, líneas 1-4.

muslos, ya que podía percibir el cañón de una pistola en ese lugar.[99] También detalló que, la parte superior del cristal del parabrisas tenía un impacto de proyectil de bala, que el cristal del retrovisor del lado del chófer estaba roto y que había dos casquillos de bala disparados cerca de la puerta del pasajero posterior.[100]

El Agente Meléndez Álvarez manifestó que, trabajó la escena con la Agente de Servicios Técnicos, Nilza Caraballo, quien se encargó de documentar la escena en fotos y realizar las solicitudes necesarias. [101] El testigo narró que, luego de tomar las fotos exteriores de varios ángulos, procedieron a abrir la puerta del pasajero delantero y confirmó que lo que tenía el occiso entre los muslos era una pistola y un teléfono celular.[102] El Agente Meléndez Álvarez relató que procedió a descargar el arma de fuego de calibre .45 por razones de seguridad; que estaba cargada con un magacín de 12 balas en el cargador y una bala en la cámara.[103] Detalló que, el teléfono celular tenía como fondo o *wallpaper* una foto de la misma persona que está muerta en el asiento del pasajero delantero.[104]

El Agente Meléndez Álvarez especificó que, procedieron a sacar el cuerpo del automóvil y se percató de que había un proyectil disparado en el piso del asiento del pasajero frontal, que había otro incrustado en la parte derecha del *dash* del carro y que había un disparo de adentro hacia afuera en el cristal delantero.[105] Añadió que, cuando inspeccionaron el asiento del pasajero delantero, pudieron observar tres perforaciones redondas y regulares, que aparentaban ser de proyectil de bala, con origen de atrás hacia al frente.[106] Detalló que los proyectiles ocupados fueron tres en total:

---

[99] *Íd.*, pág. 214, líneas 6-10.
[100] *Íd.*, pág. 214, líneas 19-30; pág. 215, líneas 1-3.
[101] *Íd.*, pág. 215, líneas 27-29; pág. 216, líneas 1-2.
[102] *Íd.*, pág. 216, líneas 12-21.
[103] *Íd.*, pág. 216, líneas 22-30; pág. 217, líneas 1-5.
[104] *Íd.*, pág. 217, líneas 9-19.
[105] *Íd.*, pág. 217, líneas 22-28.
[106] *Íd.*, pág. 219, líneas 9-21.

dos afuera del vehículo y uno en el interior sobre el asiento de atrás; todos calibre .40.[107] Atestó que, retuvo personalmente la custodia del teléfono celular del occiso hasta que lo entregó al ICF para su correspondiente análisis.[108]

Luego de contestar preguntas del Ministerio Público sobre la prueba ocupada y fotos de la escena, el Agente Meléndez Álvarez narró haber identificado cámaras de seguridad cercanas en la gasolinera "Total", en la farmacia "Wilson" y en el negocio "Pastrami".[109] Declaró haber ocupado en el vehículo un acta de nacimiento y otros documentos a nombre de Edwin Marcucci Soto.[110] El Agente Meléndez Álvarez relató que, mientras investigaba la escena, un oficial municipal de nombre Pedro Sánchez, notificó que había un herido de bala en el Hospital San Lucas de Ponce que tenía más información sobre lo ocurrido.[111]

A lo antes añadió que, fue al hospital donde se encontraba el herido, que dijo llamarse Edwin Marcucci Soto, a quien el Agente Meléndez Álvarez describió como un caballero que vestía una bata amarilla de hospital; quejándose de dolor; con sangre seca en el hombro y mano derecha; delgado; joven; de 5'8"-5'9" de estatura; 160 libras; ojos color café y que no tenía mucho cabello.[112] El agente narró que le retrataron las heridas y que pudo observar que tenía una herida de bala redonda en el hombro izquierdo, pero en la parte cerca del cuello y otra en forma de línea e irregular en el hombro izquierdo.[113] Según su testimonio, la forma de línea indicaba que era una herida de salida de bala y la forma redonda indicaba una herida de entrada de bala.[114] Explicó, además, que el disparo que sufrió el

---

[107] *Íd.*, pág. 220, líneas 1-5.
[108] *Íd.*, pág. 227, líneas 18-25.
[109] *Íd.*, pág. 246, líneas 9-23.
[110] *Íd.*, pág. 246, líneas 25-27.
[111] *Íd.*, pág. 248, líneas 16-29; pág. 249, líneas 1-6.
[112] *Íd.*, pág. 249, líneas 29-30; pág. 250, líneas 1-6.
[113] *Íd.*, pág. 250, líneas 9-14.
[114] *Íd.*, pág. 250, líneas 16-18.

señor Marcucci en el hombro derecho fue, a su entender, de atrás hacia adelante debido a la apariencia de las heridas de bala.[115]

El Agente Meléndez Álvarez expresó que, comenzó a entrevistarlo a pesar de que el caballero estaba adolorido y asustado. Dijo que el caballero le informó que el nombre del occiso era Carlos Sánchez, quien era su amigo.[116] Declaró que, el señor Marcucci le dijo que recibió una llamada de su amigo Carlos, en horas de la mañana del 18 de mayo de 2019, donde coordinaron la venta de un carro en Juana Díaz.[117] Según narró, luego de la venta del vehículo, Carlos le dijo al herido que lo llevara al Residencial Chavier en Ponce para ver a su exesposa, a lo cual el señor Marcucci accedió.[118] Adujo el Agente Meléndez Álvarez que, cuando estos iban en camino, Carlos recibió una llamada de alguien conocido por "Bebo" para que lo fuera a buscar porque estaba a pie en la Ponce Cemex, a lo cual el señor Marcucci accedió.[119] Según el herido le informó, cuando recogieron a "Bebo", este les indicó que lo llevaran al Residencial Claveles y el señor Marcucci se dirigió hacia allá en el vehículo Toyota color vino de la escena.[120]

El Agente Meléndez Álvarez declaró que, el señor Marcucci le expresó que no conocía el nombre de la persona que le disparó y que solo sabía su apodo.[121] Agregó que, cuando estaban cerca del Residencial Claveles, el señor Marcucci notó la presencia de la policía y "Bebo" le dijo: "¡vira, vira, vira! que a mí me está buscando la policía por unos *carjackings* y que porque me entré a tiros con la policía[.]"[122] Acto seguido, el señor Marcucci procedió a virar y, cuando estaban cerca del lugar de los hechos, este sacó su teléfono para llamar a su esposa y "Bebo" le ordenó que soltara y botara el

---

[115] *Íd.*
[116] *Íd.*, pág. 250, líneas 23-27.
[117] *Íd.*, pág. 251, líneas 10-21.
[118] *Íd.*, pág. 251, líneas 21-23.
[119] *Íd.*, pág. 251, líneas 23-26.
[120] *Íd.*, pág. 251, líneas 27-30; pág. 252, líneas 1-3.
[121] *Íd.*, pág. 252, líneas 7-8.
[122] *Íd.*, pág. 252, líneas 10-13.

celular y cuando el señor Marcucci miró hacia el lado, se percató de que "Bebo" le estaba apuntando a él y a Carlos con un arma de fuego color negra.[123]

El señor Marcucci narró al Agente Meléndez Álvarez que, tras escuchar detonaciones, se sintió herido al instante, una quemazón en la espalda, cuello y hombro, lo cual provocó que este halara el guía para maniobrar el vehículo, que quedó mirando hacia la Carretera Núm. 9, que la puerta del conductor no abría fácilmente y, como el cristal estaba abajo, se tiró por el cristal y se fue corriendo hacia la Urbanización Las Delicias.[124]

El Agente Meléndez Álvarez añadió que, el señor Marcucci le dijo que llegó a la casa de un señor a las 10 y pico de la noche y le pidió auxilio; que el señor le dijo al herido que se tirara al piso y el señor Marcucci se marchó corriendo para buscar ayuda en otro lugar.[125] El agente expresó que el señor Marcucci llegó a la casa de otro señor y le pidió que le prestara el celular y que lo ayudara porque estaba herido; el señor le marcó el celular y el señor Marcucci habló con su esposa, Yeraidaliz Pagán Rivera, diciéndole que lo hirieron, que el carro estaba en Las Delicias y que llamara a los familiares de Carlos.[126]

El Agente Meléndez Álvarez abundó que, le preguntó al señor Marcucci cómo conocía a "Bebo" y este le dijo que lo conocía hace varios años porque lo había visto en varias ocasiones en carreras de caballos que frecuentaba, pero que no sabía su nombre.[127] A preguntas del agente al señor Marcucci, este último describió a "Bebo" como trigueño, con pelo rizado y barba, de 180-190 libras, con tatuajes, aparentaba tener 30-33 años y medir 5'11" y que ese día vestía con un abrigo negro con un *hoodie* que no le tapaba la

---

[123] *Íd.*, pág. 252, líneas 20-30; pág. 253, líneas 1-2.
[124] *Íd.*, pág. 253, líneas 7-15.
[125] *Íd.*, pág. 253, líneas 16-27.
[126] *Íd.*, pág. 253, líneas 27-29; pág. 254, líneas 1-9.
[127] *Íd.*, pág. 254, líneas 10-13.

cara.[128] Además, el señor Marcucci le expresó al agente que vivió en Adjuntas y que "Bebo" vivió en el Sector El Feni en un momento dado y que sabía que estuvo casado con una dama que era enfermera y que era de Castañer.[129]

El Agente Meléndez Álvarez expresó que, a preguntas suyas, Marcucci le ripostó que "Bebo" fue quien le disparó a él y a su amigo con un arma de fuego.[130] Detalló haber entrevistado al señor Marcucci en cuatro ocasiones: una en el hospital, una en la Comandancia de Ponce y dos en la Comandancia de Mayagüez.[131] Según narró el agente, el señor Marcucci le informó que es vecino de Mayagüez y que tiene 34 años.[132] Además, el señor Marcucci le dijo al Agente Meléndez Álvarez que, cuando estaba en la acera de la casa del señor que lo ayudó, recordaba que había unos policías municipales allí con quienes habló, pero que se sentía muy mal y que "iba y volvía", y que, cuando vino a caer en cuenta, ya estaba en el hospital.[133]

A preguntas sobre qué ocurrió con el vehículo Toyota Corolla color vino, el agente testificó que, se ocupó y se transportó en una grúa para ponerlo bajo llaves en la División de Vehículos Hurtados, para que el investigador forense del ICF, Jerry Burgado, realice el análisis correspondiente.[134] El Agente Meléndez Álvarez añadió que, una persona de nombre Charlie Isaac Sánchez Plaza llegó al Cuartel de Ponce porque vio una noticia en las redes sociales y estaba preocupado por su hermano.[135] El agente precisó que le preguntó al señor Charlie Isaac Sánchez Plaza cuándo fue la última vez que vio al occiso y este le contestó que, el 18 de mayo de 2019, porque

---

[128] *Íd.*, pág. 254, líneas 19-28; pág. 255, líneas 10-16.
[129] *Íd.*, pág. 256, líneas 11-28.
[130] *Íd.*, pág. 257, líneas 20-23.
[131] *Íd.*, pág. 266, líneas 1-2.
[132] *Íd.*, pág. 267, líneas 20-21.
[133] *Íd.*, pág. 273, línea 29; pág. 274, líneas 1-13.
[134] *Íd.*, pág. 274, líneas 26-30; pág. 275, líneas 3-20.
[135] *Íd.*, pág. 276, líneas 1-26.

trabajaban juntos en una compañía de *landscaping*.[136] El Agente Meléndez Álvarez atestó que, inquirió a Charlie Isaac Sánchez Plaza sobre si el occiso estaba envuelto en alguna actividad delictiva, a lo cual este último le respondió que, días antes de los hechos el occiso le expresó que pensaba realizar una venta de marihuana en Ponce por $200.00.[137]

El Agente Meléndez Álvarez relató que, se reunió con la Agente Itza Torres de la División de Robos del CIC de Ponce para indagar si "Bebo" estaba bajo investigación por *carjacking*, según informó el señor Marcucci,[138] producto de lo cual, buscó el nombre de Roberto Luis Montalvo Irizarry en el sistema de *David Plus* (atado al Departamento de Transportación y Obras Públicas y cuyo propósito es corroborar identidad) y le apareció su descripción física, dirección, seguro social, fecha de nacimiento, edad, si posee algún tipo de licencia, multas y fotografía.[139] Identificó al señor Montalvo Irizarry en el juicio comparando la foto que obtuvo del sistema DAVID+ con la cara del imputado, y asegura que es la misma persona.[140]

El Agente Meléndez Álvarez relató que, el señor Marcucci compareció a la Comandancia de Mayagüez, el 20 de mayo de 2019, para la correspondiente rueda de identificación por fotografías y para realizar una segunda entrevista porque, según le expresó el testigo, temía por su vida si llegaba hasta Ponce.[141] Abundó el agente que, durante esa segunda entrevista, indagó sobre la venta del vehículo efectuada en Juana Díaz antes de los hechos, a lo cual el señor Marcucci expresó que le pagaron $3,000.00, entre otros detalles.[142] Agregó que, la tercera reunión entre ellos fue muy

---

[136] *Íd.*, pág. 276, líneas 12-16.
[137] *Íd.*, pág. 276, líneas 25-30.
[138] *Íd.*, pág. 280, líneas 15-23.
[139] *Íd.*, pág. 281, líneas 9-29; pág. 282, líneas 10-15; pág. 283, líneas 197.
[140] *Íd.*, pág. 288, líneas 14-17; pág. 289, líneas 2-4.
[141] *Íd.*, pág. 294, líneas 16-25; pág. 304, líneas 2-5.
[142] *Íd.*, pág. 295, líneas 10-13.

similar a la segunda, sin embargo, en la cuarta entrevista, el señor Marcucci admitió haber mentido en cuanto a que la compraventa fue de un vehículo de motor, cuando la venta efectuada fue de 2 libras de marihuana.[143] El agente detalló que, según el señor Marcucci, le mintió porque temía por su vida y la de sus allegados.[144]

Narró que el señor Marcucci le contó que él y el occiso fueron a vender marihuana entre dos residenciales públicos cercanos a Ponce Housing.[145] Atestó que, según el señor Marcucci, el occiso se bajó del auto con un bulto para realizar la venta previamente planificada con "Bebo".[146] A cambio, el señor Marcucci recibiría "unos cuantos dólares" y otra parte del dinero era para "Bebo".[147] El agente relató que el señor Marcucci adujo que no sabía el origen de la droga, que él no andaba armado y que, cuando el occiso se montó en el carro luego de la entrega, se percató de que éste tenía un arma de fuego, la cual colocó debajo de sus piernas.[148] El agente expresó que, según el señor Marcucci, el arma con la cual le dispararon era automática.[149] Además relató que, el señor Marcucci identificó inmediatamente la fotografía #3 como el pasajero que le disparó a él y al occiso, el cual resultó ser Roberto Luis Montalvo Irizarry.[150]

El Agente Meléndez Álvarez continuó su testimonio diciendo que, surge de las cámaras de seguridad de la Farmacia Wilson que, a las 10:14 pm, se podía observar a una única persona, delgada, con camisa negra y pantalones cortos, corriendo; la cual más adelante identificó como el señor Marcucci.[151] Además, esbozó que, a las 10:25 pm, se vio cómo una primera patrulla llegó al lugar de los hechos.[152]

---

[143] *Íd.,* pág. 296, líneas 29-30.
[144] *Íd.,* pág. 296, líneas 13-21.
[145] *Íd.,* pág. 297, líneas 1-3.
[146] *Íd.,* pág. 297, líneas 4-9.
[147] *Íd.,* pág. 297, líneas 7-9.
[148] *Íd.,* pág. 297, líneas 10-17 y 26-27.
[149] *Íd.,* pág. 299, líneas 12-14.
[150] *Íd.,* pág. 311, líneas 1-8.
[151] *Íd.,* pág. 314, líneas 6-8; pág. 319, línea 9.
[152] *Íd.,* pág. 318, líneas 23-25.

El Agente Meléndez Álvarez narró haber entrevistado al Agente Erick Ortiz Toro, días después de los hechos, quien relató que el señor Marcucci llegó a su casa gritando que estaba herido y que le habían disparado, que le dijo al señor Marcucci que se tirara al piso en lo que él buscaba su arma de reglamento y su teléfono pero, cuando salió de su casa, el señor Marcucci ya no estaba, por lo que lo siguió buscando hasta que llegó la policía a su hogar y lo entrevistaron, momento en el cual llegó un individuo de pelo blanco a decirles que el herido estaba en su casa.[153] Detalló que, también entrevistó al Sr. Jaime Pagán, quien ayudó al señor Marcucci;[154] y al Sargento Pedro Sánchez, quien hacía patrullaje preventivo junto con el Agente Rafael Mercado Orta.[155]

En el contrainterrogatorio, el Agente Meléndez Álvarez aclaró que no se ocupó otro teléfono celular en el área[156] y que no se realizaron gestiones para investigar el río o el monte cercano al lugar de los hechos.[157] Inquirido sobre si confirmó en la escena si el vehículo maniobró y terminó orientado a la dirección de dónde venía, contestó en la negativa,[158] y describió que -según la foto-, las gomas estaban derechas.[159] Añadió que, el cristal del conductor estaba abajo, mientras que los demás estaban arriba.[160]

A preguntas de la defensa, aseveró que pudo haber tomado notas en el hospital pero que, es luego del hospital, que redactó la entrevista de campo.[161] Cuestionado sobre cuál descripción de "Bebo" era mejor, la que ofreció sin haber tomado notas o la brindada tras tomar anotaciones, ripostó que "[a]mbas [descripciones] son las mejores".[162] Se reafirmó en que, en los vídeos

---

[153] Íd., pág. 319, líneas 28-30; pág. 320, líneas 7-26; pág. 321, líneas 15-18.
[154] Íd., pág. 321, líneas 23-28.
[155] Íd., pág. 323, líneas 19-27.
[156] Íd., pág. 354, líneas 3-7.
[157] Íd., pág. 356, líneas 25-30; pág. 357, línea 1.
[158] Íd., pág. 361, líneas 18-23.
[159] Íd., pág. 361, líneas 28-30; pág. 362, líneas 1-3.
[160] Íd., pág. 363, líneas 1-3.
[161] Íd., pág. 369, líneas 1-17.
[162] Íd., pág. 379, líneas 17-28.

obtenidos de las cámaras de seguridad de la Farmacia Wilson, únicamente se ve a Edwin corriendo, y expresó no recordar haber visto que, justamente después de ese visual, venían más personas caminando.[163]

Durante el contrainterrogatorio, admitió que no hizo constar en su informe, quién era el sospechoso de la comisión de los delitos. Posteriormente, a preguntas del Ministerio Público en el re-directo, expresó que, no es necesario ni obligatorio hacer constar tal dato en su informe.[164]

Continuadas las preguntas del Ministerio Público durante el re-directo, el Agente Meléndez Álvarez informó que, entrevistó a Yeraidaliz Pagán Rivera, la expareja del señor Marcucci, y que ella le manifestó haber visto al señor Marcucci, la mañana del 18 de mayo de 2019, en Adjuntas, porque tenían una hija en común y que su expareja le dijo que se dirigía hacia Mayagüez.[165]

Con respecto a sus gestiones luego de que el señor Marcucci le ofreció la descripción del apodado "Bebo", el Agente Meléndez Álvarez reiteró haber hablado con la Agente Itza Torres, de la División de Robos de Ponce, tarea que aseguró haber plasmado en sus notas las cuales, a petición de la defensa, comparó ambas copias.[166] Acto seguido, el Ministerio Público solicitó al foro primario que tomase conocimiento judicial de que las notas del Agente Meléndez Álvarez fueron entregadas a la defensa, lo cual suscitó un planteamiento de derecho de la defensa que abordaremos más adelante.[167] Atestó el agente, mientras contestaba preguntas sobre el *line up,* que la persona que ocupa la tercera posición en la rueda de confrontación es conocido por "Bebo", es sospechoso de un *carjacking* y es Roberto Luis Montalvo Irizarry.[168]

---

[163] *Íd.*, pág. 409, líneas 15-22.
[164] *Íd.*, pág. 402, líneas 1-7; pág. 463, líneas 13-20.
[165] *Íd.*, pág. 454, líneas 6-11, 22-28.
[166] *Íd.*, pág. 457, líneas 11-30; pág. 458, líneas 1-6.
[167] *Íd.*, pág. 458, líneas 11-12.
[168] *Íd.*, pág. 467, líneas 24-30.

**Agente Jason Rodríguez**

El Agente Rodríguez testificó que, labora en la Sección Técnica de Grabaciones de la Policía en Ponce, en donde se recopila la evidencia digital que fuera necesaria para la investigación de cualquier tipo de delito.[169] El testigo relató que, en horas de la tarde del 21 de mayo de 2019, recibió instrucciones de su supervisor para que se comunicara con el Agente Francisco Meléndez, de la División de Homicidios, quien tenía un *subpoena* para extraer vídeos de unas cámaras de seguridad, por unos hechos ocurridos el 18 de mayo de 2019, en la intersección de la Carretera 123.[170]

El Agente Rodríguez detalló que fue, junto con el Agente Meléndez Álvarez, a la Gasolinera Total -ubicada en la Urbanización Las Delicias, en Ponce-, a la Farmacia Wilson en Las Delicias y a la Gasolinera Gulf de la Carretera 123, para extraer vídeos de sus cámaras de seguridad, correspondientes al 18 de mayo de 2019 entre 9:00 y 11:00 pm.[171] Abundó que, en la gasolinera Total, extrajo imágenes de dos de las diez cámaras de seguridad.[172] El Agente Rodríguez expresó que, en la Farmacia Wilson, solo extrajo imágenes de la cámara #2, aunque había 8 cámaras de seguridad.[173] Por último, el testigo describió que, en la Gasolinera Gulf, recopiló imágenes de cuatro (4) de las diez y seis (16) cámaras en funcionamiento, en particular, las que daban hacia el exterior.[174]

El Ministerio Público mostró al Agente Rodríguez un disco DVD el cual identificó como contentivo de las imágenes correspondientes a la cámara #2 de la Farmacia Wilson.[175] El Agente observó que, a las 10:14 pm, se veía una silueta moviéndose en el lado superior del vídeo.[176] Cuestionado sobre en qué dirección se

---

[169] *Íd.*, pág. 482, líneas 26-27; pág. 483, líneas 3-11.
[170] *Íd.*, pág. 484, líneas 15-29.
[171] *Íd.*, pág. 485, líneas 2-8, pág. 486, líneas 21-23; pág. 487, líneas 4-11.
[172] *Íd.*, pág. 485, líneas 23-30; pág. 486, líneas 5-9.
[173] *Íd.*, pág. 486, líneas 22-30; pág. 487, líneas 1-3.
[174] *Íd.*, pág. 487, líneas 17-27.
[175] *Íd.*, pág. 488, líneas 18-20.
[176] *Íd.*, pág. 489, líneas 24-28.

movía la silueta, ripostó que "en dirección de la Gasolinera Total hacia Las Delicias."[177] Inquirido sobre qué observó entre las 10:16 y las 10:21 pm, contestó que vio vehículos entrando hacia Las Delicias desde el Garaje Total y otros desde la Farmacia Wilson hacia el Garaje Total.[178] Añadió haber observado patrullas policiales con los biombos encendidos y una ambulancia dirigiéndose hacia el referido lugar.[179] El testigo aseguró que las imágenes presentadas eran las mismas que él extrajo de las cámaras de seguridad de la Farmacia Wilson.[180]

Durante el contrainterrogatorio declaró que, a solicitud del Agente Meléndez Álvarez, extrajo grabaciones de dos de las diez cámaras del Garaje Total,[181] de una de las cámaras de la Farmacia Wilson[182] y de cuatro de las cámaras de seguridad del Garaje Gulf.[183] Con respecto a las grabaciones extraídas en fragmentos, el Agente Rodríguez aclaró que, esas cámaras en específico graban cuando detectan movimiento.[184] Por último, en el re-directo, explicó que, solo estaba encargado de extraer los vídeos y entregarlos al Agente Meléndez Álvarez.[185]

### Alex Cintrón Castellano

El señor Cintrón Castellano testificó que, es investigador forense y supervisor del ICF a cargo de analizar y reconstruir las escenas del crimen cuando se reportan muertes violentas.[186] Relató que, el 28 de mayo de 2019, se encontraba en la sección de vehículos hurtados de Ponce con el Sr. Jerry Burgado de Jesús para analizar un vehículo, según solicitado por la División de Homicidios de Ponce.[187] El señor Cintrón Castellano explicó que su función se

---

[177] *Íd.*, pág. 497, línea 4.
[178] *Íd.*, pág. 497, líneas 6-22.
[179] *Íd.*, pág. 498, líneas 11-28.
[180] *Íd.*, pág. 506, línea 24.
[181] *Íd.*, pág. 509, líneas 9-24.
[182] *Íd.*, pág. 510, líneas 16-24.
[183] *Íd.*, pág. 511, líneas 9-14.
[184] *Íd.*, pág. 513, líneas 18-22.
[185] *Íd.*, pág. 517, líneas 13-15.
[186] *Íd.*, pág. 520, líneas 1-13.
[187] *Íd.*, pág. 521, líneas 21-29.

limitó a tomar fotografías del vehículo, mientras que, su compañero Jerry Burgado de Jesús fue quien realizó el análisis y el informe pertinente al caso.[188] El testigo detalló que, tomó 112 fotos al vehículo Toyota Corolla color vino, de 4 puertas, con tablilla IEJ164.[189]

### **Jerry Burgado de Jesús**

El señor Burgado de Jesús declaró que es investigador forense del ICF, en la división de análisis y reconstrucción de trayectoria de proyectil de vehículos.[190] Añadió que, el 28 de mayo de 2019, se encontraba en el CIC de Ponce con el Sr. Alex Cintrón y con el Sargento Miguel Torres.[191] Indicó que, analizó el vehículo Toyota Corolla color vino del año 1993, con tablilla IEJ164, para atender una solicitud de trayectoria y búsqueda general que le hizo el Sargento Miguel Torres.[192]

En cuanto a las condiciones del vehículo, expresó que observó y detalló en su informe que el foco trasero derecho del vehículo se encontraba roto, que el cristal de la puerta delantera izquierda se encontraba abierto y que el cristal delantero del vehículo contenía una perforación en la parte superior, entre otros hallazgos.[193] Atestó que, conforme al análisis de sus observaciones, era compatible que la persona que disparó haya estado sentada en el asiento posterior y disparara hacia el frente.[194] En cuanto al total de perforaciones encontradas respondió que fueron siete.[195]

A preguntas de la defensa indicó que, el Sargento Miguel Torres le escribió una breve información preliminar de los hechos, como parte de la solicitud de trayectoria encomendada.[196] Aseguró

---

[188] *Íd.*, pág. 521, línea 30; pág. 522, líneas 1-11.
[189] *Íd.*, pág. 522, líneas 19-27.
[190] *Íd.*, pág. 538, líneas 5-12; pág. 539, líneas 6-8.
[191] *Íd.*, pág. 541, líneas 3-7.
[192] *Íd.*, pág. 541, líneas 17-28; pág. 544, línea 1.
[193] *Íd.*, pág. 550, líneas 4-10.
[194] *Íd.*, pág. 570, líneas 27-30; pág. 571, líneas 1-3.
[195] *Íd.*, pág. 572, líneas 21-22.
[196] *Íd.*, pág. 589, líneas 3-15.

que, no pudo establecer que en el retrovisor se produjo una perforación, toda vez que, el cristal estaba roto y ello le impidió establecer una trayectoria. [197] Análogamente, no pudo hacer hallazgo en torno al área del *dash.*[198]

### Edwin Marcucci Soto

Edwin Marcucci Soto testificó que, en la noche de los hechos, se encontraba en casa de su abuela cuando recibió una llamada de Carlos Sánchez, a quien describió como su amigo.[199] Atestiguó que Carlos le ofreció $200.00 para que lo transportara de Mayagüez a Ponce para entregar unas libras de marihuana que interesaba vender.[200] Sostuvo que, lo recogió en su Toyota Corolla, color vino, de cuatro (4) puertas.[201] Indicó que andaba solo y que Carlos se ubicó en el asiento de pasajero frontal camino a los residenciales Clavel y Ponce Housing en Ponce.[202]

Describió el área a la cual llegaron como oscura y que allí había dos (2) muchachos esperando en un carro blanco.[203] Añadió que, Carlos salió del vehículo y les entregó a esas personas la droga dentro de un bulto cerrado.[204] Adujo que conocía del contenido del bulto porque Carlos se lo dijo.[205] Sostuvo que, a Carlos le entregaron $3,000.00 y se montó en el carro, en el asiento del pasajero.[206] Añadió que, Carlos sacó una pistola oscura, calibre .40 ó .45 y la colocó debajo del muslo, luego de lo cual, se dirigieron hacia una planta de cemento para que Carlos le diera un dinero a "Bebo" por conseguirnos la venta de la marihuana, cuantía que aseveró desconocer.[207]

---

[197] *Íd.,* pág. 603, líneas 15-22.
[198] *Íd.,* pág. 603, líneas 20-25.
[199] *Íd.,* pág. 607, líneas 11-20.
[200] *Íd.,* pág. 608, líneas 16-22.
[201] *Íd.,* pág. 609, líneas 1-8.
[202] *Íd.,* pág. 609, líneas 9-25.
[203] *Íd.,* pág. 611, líneas 5-30.
[204] *Íd.,* pág. 612, líneas 8-18.
[205] *Íd.,* pág. 612, líneas 21-24.
[206] *Íd.,* pág. 613, líneas 5-14.
[207] *Íd.,* pág. 613, líneas 17-24; pág. 614, líneas 1-4 y 16-17.

Narró que se dirigieron hacia Ponce Cemex para recoger a "Bebo", lo cual supo por una llamada que le hizo Bebo a Carlos.[208] Estando en dicho lugar, observó que "Bebo" venía solo y a pie caminando de frente, y se montó en el asiento de atrás del vehículo.[209] Detalló que vestía un abrigo negro, con el gorro del abrigo puesto por la cabeza.[210] A preguntas del Ministerio Público expresó que "Bebo" se montó en el asiento de atrás de Carlos.[211] Sostuvo que, "Bebo" les pidió que lo llevaran a Claveles.[212] Relató que, cuando estaban entrando a Claveles, se encontraron con que la Policía estaba allí y "Bebo" les dijo que viraran.[213] Indicó que, la razón por la cual "Bebo" no podía entrar a Claveles era porque lo buscaba la Policía por unos *carjackings*.[214] Testificó que, al virar, se dirigieron a un área cerca de Las Delicias.[215]

Expresó que, llegaron a un área cerca de un supermercado y decidió llamar a quien era su esposa, Yeraidaliz Pagán.[216] Manifestó que, "Bebo" le dijo que botara el teléfono y cuando mira hacia atrás, hacia su lado derecho, ve que "Bebo" lo está apuntando a él y a Carlos con una pistola.[217] Aseveró que soltó el teléfono y que "Bebo" dijo que "el mundo era chiquito", antes de dispararles a él y a Carlos.[218] Inquirido sobre qué hizo Carlos al escuchar esa expresión relató que, se miraron y Carlos le dijo "Macu corre", luego de lo cual, escuchó los tiros.[219] A preguntas sobre qué pasó con el vehículo, ripostó que, cuando sintió los disparos, viró en "u" y se tiró del vehículo por el cristal del chofer, que estaba bajado, porque la

---

[208] *Íd.,* pág. 614, líneas 18-24; pág. 615, líneas 4-7.
[209] *Íd.,* pág. 615, líneas 25-29; pág. 616, líneas 1-7.
[210] *Íd.,* pág. 616, líneas 8-20.
[211] *Íd.,* pág. 617, líneas 24-25.
[212] *Íd.,* pág. 618, líneas 12-14.
[213] *Íd.,* pág. 619, líneas 15-17.
[214] *Íd.,* pág. 619, líneas 18-20; pág. 620, líneas 12-14.
[215] *Íd.,* pág. 620, líneas 21-30.
[216] *Íd.,* pág. 621, líneas 1-11.
[217] *Íd.,* pág. 621, líneas 22-29; pág. 622, líneas 1-9.
[218] *Íd.,* pág. 622, líneas 11 y 19-26.
[219] *Íd.,* pág. 622, líneas 27-29; pág. 623, líneas 1-2.

puerta casi no abría.[220] Añadió que Carlos, estaba dentro del carro.[221]

Continuó relatando que, corrió hacia la Urbanización Las Delicias y llegó a una casa en la que había gente en el balcón.[222] El que estaba en la casa me dijo que me tirara al piso o que me darían otro tiro más.[223] Reveló que fue a esa casa para pedir ayuda porque él y su amigo estaban heridos.[224] Afirmó que sentía un dolor inmenso en el hombro derecho por el disparo, que salió por su clavícula.[225]

Añadió que, continuó corriendo y llegó a otra casa en donde un señor le compartió su teléfono, para notificarle a su entonces esposa lo sucedido porque no sabía si se iba a morir.[226] A preguntas sobre dónde estaba su teléfono ripostó que lo había botado.[227] Afirmó que, durante la llamada, le pidió a su exesposa que se comunicara con su hermana para que ella avisara a la familia de Carlos sobre lo ocurrido y que "Bebo" les había disparado.[228] Atestiguó que, estando allí, llegó un guardia municipal y una ambulancia, pero no recuerda nada más hasta que se encontró en el Hospital San Lucas en Ponce.[229]

Alegó que, en el hospital, fue entrevistado por esta fiscal y por el Agente Meléndez.[230] Admitió que, le informó al Agente Meléndez que en el carro había un dinero producto de una venta de otro vehículo realizada en Ponce.[231] Detalló que, el vehículo objeto de venta también era un Toyota Corolla color vino, vendido en $3,000.00.[232] Señaló que, le dijo al Agente Meléndez que "Bebo" les

---

[220] *Íd.,* pág. 623, líneas 28-30; pág. 624, líneas 1-12.
[221] *Íd.,* pág. 624, línea 30.
[222] *Íd.,* pág. 624, líneas 21-25; pág. 625, líneas 10-11.
[223] *Íd.,* pág. 625, líneas 13-15.
[224] *Íd.,* pág. 625, líneas 18-21.
[225] *Íd.,* pág. 625, líneas 22-26.
[226] *Íd.,* pág. 626, líneas 11-30.
[227] *Íd.,* pág. 627, líneas 1-2.
[228] *Íd.,* pág. 627, líneas 3-7.
[229] *Íd.,* pág. 627, líneas 10-20.
[230] *Íd.,* pág. 627, líneas 21-22.
[231] *Íd.,* pág. 630, líneas 18-30.
[232] *Íd.,* pág. 631, líneas 5-10.

disparó a él y a Carlos con un arma de fuego.[233] Reconoció que le mintió al Agente Meléndez por el dinero y porque temía por su vida. [234] Añadió que, posteriormente, el Agente Meléndez lo entrevistó en la comandancia de Mayagüez y allí le admitió que la venta del carro fue una mentira, y notificó sobre la venta de marihuana.[235]

Atestiguó que, conocía a "Bebo" por el mundo de las carreras de caballos desde hacía un año y pico.[236] Alegó que "Bebo" y Carlos se conocían porque ambos vivieron en el Residencial Chavier.[237] El señor Marcucci señaló e identificó en sala al apelante como "Bebo", la persona que le disparó a él y a Carlos.[238]

El señor Marcucci continuó declarando que, el 20 de mayo de 2019, el Agente Meléndez lo llamó para que llegara a la Comandancia de Mayagüez para el *line up*, en donde le mostró nueve fotografías de personas parecidas y el señor Marcucci identificó a "Bebo" como el tercero de la parte de arriba.[239] Manifestó que, en ese momento, no conocía el verdadero nombre de "Bebo".[240]

Durante el contrainterrogatorio, el señor Marcucci reveló que vio que Carlos tenía un arma de fuego durante el trayecto de Mayagüez a Ponce, y que siempre la tuvo entre medio de las piernas y debajo de los muslos.[241] Ante un cuestionamiento de la defensa, reconoció que durante el directo en el juicio declaró que el arma que portaba Carlos era .40 ó .45, y que ya le había manifestado al Agente Meléndez Álvarez durante la etapa de investigación que se trataba de un arma automática, a pesar de que, durante la vista preliminar, había verbalizado no conocer de armas de fuego.[242] En cuanto al

---

[233] *Íd.,* pág. 631, líneas 23-30; pág. 632, líneas 1-3.
[234] *Íd.,* pág. 632, líneas 4-9.
[235] *Íd.,* pág. 632, líneas 21-30; pág. 633, líneas 1-2.
[236] *Íd.,* pág. 634, líneas 22-29.
[237] *Íd.,* pág. 637, líneas 23-27.
[238] *Íd.,* pág. 638, líneas 10-30.
[239] *Íd.,* pág. 639, líneas 13-30; pág. 640, líneas 1-5.
[240] *Íd.,* pág. 643, líneas 20-21.
[241] *Íd.,* pág. 665, líneas 19-30; pág. 666, líneas 1-4; pág. 669, líneas 16-23.
[242] *Íd.,* pág. 695, líneas 1-16.

contenido de la llamada que hizo a su exesposa luego de los hechos, negó haberle pedido que lo fuera a buscar,[243] y admitió que, durante la vista preliminar, no declaró que en esa llamada le pidió a su exesposa que se comunicara con la familia de Carlos.[244] Expresó haberle dicho al Agente Meléndez Álvarez que no tenía el teléfono de "Bebo".[245]

Durante el re-directo, declaró no haber recuperado los $3,000.00. [246] A preguntas de la defensa en el re-contrainterrogatorio expresó que, Carlos le dijo camino a Ponce que "Bebo" fue quien consiguió el contacto para vender la sustancia controlada.[247]

### Agente Miguel A. Quiñones Carrasquillo

El Agente Quiñones Carrasquillo manifestó que labora en la Sección Monodactilar de la División de Identificación Criminal.[248] Indicó que cuando le brindan una huella encontrada en una escena de crimen, conocida como huella latente, la analiza en búsqueda de características suficientes que le permitan hacer una comparación con la base de datos.[249]

Declaró que, el 24 de mayo de 2019, recibió una solicitud de análisis e identificación de huellas dactilares por parte de la Agente Nilza Caraballo.[250] Dicha solicitud estaba relacionada con un caso de asesinato en la Urbanización Las Delicias en Ponce, cometido el 19 de mayo de 2019.[251] Indicó que se trataba de cuatro (4) huellas que levantó la Agente Nilza Caraballo de un Toyota Corolla, color vino, tablilla IEJ164.[252]

---

[243] *Íd.,* pág. 697, líneas 6-17.
[244] *Íd.,* pág. 698, líneas 9-22.
[245] *Íd.,* pág. 712, línea 30; pág. 713, línea 1.
[246] *Íd.,* pág. 728, líneas 16-17.
[247] *Íd.,* pág. 731, líneas 1-14.
[248] *Íd.,* pág. 734, líneas 1-2
[249] *Íd.,* pág. 738, líneas 7-23.
[250] *Íd.,* pág. 738, líneas 21-27.
[251] *Íd.,* pág. 741, líneas 21-29.
[252] *Íd.,* pág. 743, líneas 1-5.

Durante el contrainterrogatorio detalló que las huellas analizadas son todas del exterior del vehículo, en particular: el cristal pequeño exterior de la puerta trasera izquierda; marco de la puerta trasera lado derecho exterior; cristal exterior de la puerta trasera derecha; y "*hander*" (manija) exterior puerta trasera lado derecho.[253] Reconoció que, en el primer ejercicio visual que realizó con una lupa no obtuvo un valor identificativo de posibles candidatos.[254]

### Luz E. Cardona Lugo

La señora Cardona Lugo expresó que es seróloga forense del ICF,[255] a cargo de verificar si la evidencia recibida contiene alguna mancha de origen biológico para llevar a cabo un análisis de ADN.[256] Testificó que, el 19 de diciembre de 2019, recibió tres (3) muestras. Específicamente, el DNA 19-592, que corresponde al aplicador que se levantó del "*hander*" (manija) interior de la puerta trasera derecha de un Toyota Corolla, de color vino, tablilla IEJ164; el DNA-19-1179, perteneciente al colector bucal del señor Montalvo Irizarry DNA-19-0592; y, el MBP-19-0274 sobre una muestra de sangre que se tomó del occiso.[257] Puntualizó que, en cuanto a las muestras tomadas de la manija del vehículo, luego de realizar el procedimiento para extraer el ADN, no detectó material genético suficiente, por lo cual, detuvo el proceso de análisis.[258]

En respuesta a preguntas de la defensa, la señora Cardona Lugo reiteró que, la insuficiencia del material genético puede ocurrir: si la superficie se toca bien brevemente, sin dejar bastante material que sea detectable; o que nadie tocó la superficie; o por haber utilizado algo para cubrirse las manos.[259]

---

[253] *Íd.,* pág. 749, líneas 21-25.
[254] *Íd.,* pág. 751, líneas 4-19.
[255] *Íd.,* pág. 756, líneas 1-4.
[256] *Íd.,* pág. 756, líneas 6-10.
[257] *Íd.,* pág. 761, líneas 24-30; pág. 762, líneas 1-8; pág. 769, líneas 21-26.
[258] *Íd.,* pág. 769, líneas 19-21; pág. 771, líneas 22-24.
[259] *Íd.,* pág. 779, líneas 1-20.

### Mirella Hernández Arroyo

La señora Hernández Arroyo declaró que, labora en el ICF como supervisora del laboratorio forense de ADN y serología, y fue quien entregó al receptor una evidencia sellada, bajo su custodia y bajo llave, para atender una solicitud de servicio forense o solicitud de análisis, acompañada de una cadena de custodia de la cual surgen las firmas de las personas del instituto que entraron en contacto con la evidencia.[260]

### Sargento Miguel Torres Reyes

El Sargento Miguel Torres Reyes de la División de Homicidios de Ponce declaró sobre la cadena de custodia relacionada al vehículo Toyota Corolla color vino, tablilla IEJ164, y la evidencia de allí sustraída, la cual entregó al Agente Luis A. Rodríguez Rangel de la Fiscalía de Ponce.[261] Aclaró a preguntas de la defensa que, los investigadores forenses analizan la solicitud de búsqueda y trayectoria en consideración a la información preliminar de los hechos que el ICF tiene.[262]

### Julia Hernández Arroyo

La señora Hernández Arroyo testificó que, para el año 2019, supervisaba la sección de evidencia digital y multimedia del ICF.[263] Expuso que, con relación al presente caso, realizó el análisis forense de un teléfono celular entre octubre y noviembre de 2019.[264] Especificó que, el celular era de la marca LG, color gris, con el cristal quebrado y que contenía una tarjeta SIM enumerada.[265] Sostuvo que el análisis pudo ser realizado por razón del consentimiento brindado por el Sr. Isaac Sánchez Vázquez, el 20 de junio de 2019, y quien identificó que el celular pertenecía al occiso.[266] Además,

---

[260] *Íd.,* pág. 780, líneas 23-26; pág. 781, líneas 11-29; pág. 782, líneas 1-2.
[261] *Íd.,* pág. 790, líneas 3-30.
[262] *Íd.,* pág. 797, líneas 19-28.
[263] *Íd.,* pág. 802, líneas 16-27.
[264] *Íd.,* pág. 803, líneas 13-18.
[265] *Íd.,* pág. 811, líneas 6-22.
[266] *Íd.,* pág. 814, líneas 4-8.

declaró que, la solicitud de análisis era referente a la identificación de llamadas y mensajes entre las fechas del 17 al 19 de mayo, entre otras categorías.[267]

Con relación al 18 de mayo de 2019, detalló los horarios de varias llamadas registradas en el celular de un contacto identificado como "Geño", todas en la noche.[268] Añadió que, a las 10:46 de la noche, el celular registró una llamada perdida, realizada a través de *Facebook,* del usuario identificado como "Eugenio Mangual" al usuario identificado como "Carlos Sánchez".[269] Agregó que, a las 8:26, se registró una llamada saliente a un contacto identificado como "Kevin"[270] y, a las 7:18 pm, se registró una llamada saliente al contacto guardado como "Marcucci".[271] Continuó narrando que, a la 1:19 de la tarde, se registró una llamada saliente al contacto identificado como "Geño" y una llamada entrante del contacto "Marcucci".[272] Informó que, a las 9:32 de la mañana, se registró una llamada saliente al contacto identificado como "Charlie".[273] En cuanto a los registros de *WhatsApp* testificó que, el 18 de mayo de 2019, a las 9:58 pm, se registró un mensaje de audio de salida del usuario "Carlos" al usuario "Ferdi y Diana".[274]

Durante el contrainterrogatorio, la testigo abundó que, en el dispositivo se registraron dos (2) llamadas, una entrante y otra saliente, del contacto identificado como "Charly".[275] Asimismo, una llamada saliente al contacto registrado como "Gaby".[276] Sostuvo que, del análisis realizado, no encontró ninguna identificación de contacto bajo el nombre Roberto Luis Montalvo Irizarry.[277] De igual forma, no encontró ninguna identificación bajo los nombres

---

[267] *Íd.*, pág. 814, líneas 8-10.
[268] *Íd.,* pág. 818, líneas 17-29; pág. 819, líneas 18-25; pág. 820, líneas 10-16.
[269] *Íd.,* pág. 819, líneas 7-11.
[270] *Íd.,* pág. 820, líneas 16-19.
[271] *Íd.,* pág. 820, líneas 26-30; pág. 821, líneas 1-2.
[272] *Íd.,* pág. 821, líneas 4-11.
[273] *Íd.,* pág. 821, líneas 12-16.
[274] *Íd.,* pág. 823, líneas 28-29; pág. 824, líneas 1-2; pág. 825, líneas 20-23.
[275] *Íd.,* pág. 862, líneas 10-16.
[276] *Íd.,* pág. 863, líneas 2-6.
[277] *Íd.,* pág. 865, líneas 28-30; pág. 866, líneas 1-7.

"Roberto", "Luis", "Luisito" o alguno de los derivados de "Luis",[278] ni bajo "Bebo".[279] Además, expuso que no se le solicitó que realizara un análisis de triangulación del dispositivo para ubicar el mismo en un lugar en particular.[280] No obstante, aclaró que, como parte de sus funciones, no realiza este tipo de análisis.[281]

### Murphy Rivera Alicea

El señor Rivera Alicea declaró que, para el año 2019, trabajaba en la división de control y custodia de evidencia en el ICF.[282] Detalló la evidencia relacionada a estos hechos recibida en el ICF para ser analizada, entre otras, arma de fuego, abastecedor, proyectiles, casquillos.[283] A preguntas de la defensa, expresó no participar del análisis de la evidencia presentada.[284]

Los siguientes funcionarios del ICF declararon sobre el recibo, la preparación, el embalaje y la preservación de la evidencia que la Policía de Puerto Rico recolectó en la escena y luego entregó al ICF para su posterior análisis: **Yamaira Isis Falú Carrasquillo** (Técnico de Control y Custodia de Evidencia),[285] **Rosa Delia Guerrero López** (Técnica de Sala de Autopsia),[286] **Félix Vázquéz Solís** (Técnico de Control y Custodia),[287] **Kiara Rodríguez García** (Técnica de Control y Custodia)[288] y **María Hernández Miranda** (Técnica de Control y Custodia).[289]

### Agente Luis A. Rodríguez Rangel

El Agente Rodríguez Rangel narró que labora como agente de investigación de la Fiscalía de Ponce, asignado al cuarto de evidencia, entre otras funciones.[290] Declaró sobre la cadena de

---

[278] *Íd.,* pág. 877, líneas 6-11.
[279] *Íd.,* pág. 870, líneas 12-21.
[280] *Íd.,* pág. 888, líneas 22-24; pág. 889, líneas 6-10.
[281] *Íd.,* pág. 891, líneas 22-24.
[282] *Íd.,* pág. 905, líneas 18-21.
[283] *Íd.,* pág. 908, líneas 15-27.
[284] *Íd.,* pág. 920, líneas 9-14.
[285] *Íd.,* págs. 921-925.
[286] *Íd.,* págs. 926-933.
[287] *Íd.,* págs. 934-955.
[288] *Íd.,* págs. 956-966.
[289] *Íd.,* págs. 1003-1008.
[290] *Íd.,* pág. 966, líneas 18-24.

custodia del teléfono celular marca LG; de la pistola marca Armory, modelo XD45; dos proyectiles; tres casquillos de bala; una bala sin disparar; un proyectil revestido; y las muestras DNA-19-1179, DNA-19-0592 y MBP-19-0274 que recibió del Agente Elmer N. Rodríguez Vega y del Agente Francisco Meléndez Álvarez, las cuales ubicó en el cuarto de evidencia bajo su custodia hasta el día en que las trajo al tribunal para entregarlas como evidencia.[291]

### Roberto Ferreira García

El señor Ferreira García informó ser reservista teniente del Registro de Armas del Cuartel General, a cargo de evaluar las solicitudes de licencias de armas de fuego.[292] Indicó que, cuando recibe un *subpoena,* para conocer si una persona posee licencia de armas, verifica en el sistema real o división electrónica en donde aparecen todas las personas que tienen licencia de armas de fuego.[293] Especificó que, realiza la búsqueda a través del primer y segundo nombre, los dos apellidos, el número de seguro social y la fecha de nacimiento de la persona.[294] Referente al señor Montalvo Irizarry, atestó que, introdujo su nombre completo, su seguro social y su dirección, y el sistema reflejó que no tenía licencia de armas de fuego.[295]

### Agente Elmer Rodríguez Vega

El Agente Rodríguez Vega narró que, para el año 2019, trabajaba en la oficina de homicidios del CIC.[296] Detalló que, el 14 de noviembre de 2019, recogió una evidencia en el ICF, relacionada a los hechos de este caso, y la entregó en la Fiscalía de Ponce, al siguiente día.[297]

---

[291] *Íd.,* págs. 967-970.
[292] *Íd.,* pág. 1008, líneas 15-23.
[293] *Íd.,* pág. 1008, líneas 29-30; pág. 1009, líneas 1-10.
[294] *Íd.,* pág. 1009, líneas 13-16.
[295] *Íd.,* pág. 1009, líneas 23-27.
[296] *Íd.,* pág. 1020, líneas 8-9.
[297] *Íd.,* págs. 1020-1023.

### Dra. Irma Rivera Diez

La doctora Rivera Diez testificó que es patólogo forense en el ICF y que realizó la autopsia del occiso, el 25 de mayo de 2019.[298] Relató que, identificó seis (6) heridas de bala en la superficie corporal del occiso.[299] Abundó que, la primera estaba localizada en la parte derecha de atrás de la cabeza y la trayectoria de la bala fue de derecha a izquierda, de arriba hacia abajo y de atrás hacia adelante, la cual describió como "una herida que por sí sola es fatal."[300]

Además, identificó tres (3) heridas de bala en el área izquierda del tórax posterior,[301] compatibles con que, al recibirlas, la persona estuviese sentada en un vehículo de motor y estas provienen de la parte posterior, estando el asiento entre medio del atacante y la víctima.[302] Describió una herida de bala en el antebrazo derecho, compatible con que, al recibirla desde la parte de atrás, la víctima haya levantado su antebrazo para defenderse.[303] Análogamente, identificó una herida de bala en la mano izquierda, también compatible con una herida de defensa.[304] A preguntas sobre cuál fue la causa de muerte de Carlos Isaac Sánchez Plaza, la Dra. Rivera Diez atestó que, su muerte fue causada por heridas de bala.[305]

Durante el contrainterrogatorio, la Dra. Rivera Diez opinó que ninguna de las heridas de bala fue hecha en ausencia de un objeto intermedio.[306] En cuanto a la distancia a la cual se hicieron las heridas de bala, de no haber habido un objeto intermedio, la Dra. Rivera Diez ripostó a la defensa que, una posibilidad es que fueron hechas a más de dos pies de distancia.[307]

---

[298] *Íd.,* pág. 1024, líneas 26-29; pág. 1028, líneas 12-22.
[299] *Íd.,* pág. 1032, líneas 16-20.
[300] *Íd.,* pág. 1037, líneas 3-8; pág. 1039, línea 14.
[301] *Íd.,* pág. 1039, líneas 18-21.
[302] *Íd.,* pág. 1042, líneas 12-15; pág. 1044, líneas 1-13.
[303] *Íd.,* pág. 1048, líneas 6-9 y 28-30; pág. 1049, líneas 1-7.
[304] *Íd.,* pág. 1050, líneas 5-16.
[305] *Íd.,* pág. 1059, líneas 15-17.
[306] *Íd.,* pág. 1062, líneas 16-22.
[307] *Íd.,* pág. 1074, líneas 9-16; pág. 1075, líneas 26-30.

Sobre este asunto, en el re-directo aclaró que, si hubo un objeto intermedio, la distancia puede haber sido menor a dos pies.[308] Puntualizó que, si el objeto intermedio es de tela, guata o diferentes capas de ropa, no es usual encontrar residuos de esto en el cuerpo, distinto a un cristal.[309]

### Aramis Agosto Vega

El señor Agosto Vega testificó que es examinador de armas de fuego en el ICF.[310] Expresó que, sus funciones consisten en examinar armas de fuego, llevar a cabo los exámenes periciales, comparaciones y exámenes microscópicos a proyectiles de bala, casquillos de bala, exámenes de restauración de número de serie en armas de fuego y exámenes de marcas de herramientas.[311] Informó que, tras realizar las evaluaciones correspondientes, determinó que, el arma de fuego sometida en este caso para su análisis, era capaz de disparar; que los tres casquillos fueron disparados por una misma arma de fuego; y que los tres casquillos eran todos calibre .40.[312] Descartó que, los proyectiles y casquillos encontrados en la escena fuesen disparados por el arma de fuego hallada en la escena, por tratarse de calibres distintos.[313] Sustentó lo antes en que, el arma de fuego encontrada en la escena era calibre .45.[314]

Inquirido por la defensa, atestó que, el sonido de la detonación de un arma semiautomática puede ser igual a la de un arma "normal", dependiendo de la destreza de la persona que está utilizando el arma de fuego.[315]

Por último, sobre la solicitud de arrestos especiales en contra del señor Montalvo Irizarry, el Ministerio Público sentó a testificar a

---

[308] *Íd.,* pág. 1090, líneas 17-24.
[309] *Íd.,* pág. 1090, líneas 28-30; pág. 1091, líneas 1-7.
[310] *Íd.,* pág. 1123, líneas 12-14.
[311] *Íd.,* pág. 1124, líneas 14-20.
[312] *Íd.,* pág. 1137, líneas 7-25; pág. 1138, línea 19.
[313] *Íd.,* pág. 1140, líneas 1-8.
[314] *Íd.,* pág. 1140, líneas 10-11.
[315] *Íd.,* pág. 1148, líneas 5-9.

los agentes **Salvador Núñez Zayas**[316] y **José Sánchez Colón**.[317] Cabe señalar que, este juicio fue objeto de paralización por esta Curia (Recurso Núm. KLCE202300028), desde el 15 de febrero de 2023 hasta el 31 de julio de 2023. Lo antes, debido a la oposición de la defensa a que el Ministerio Público presentara el testimonio del Agente Núñez Zayas. Evaluado el asunto, este Tribunal autorizó su testimonio limitado a las gestiones que realizó para dar con el paradero del acusado y su eventual arresto.

Culminado el desfile de prueba, el 7 de agosto de 2023, el TPI ordenó a las partes a presentar, por escrito, aquellas instrucciones específicas que interesaban que fuesen impartidas al jurado, para lo cual les concedió hasta las 5:00 pm de ese día. En la correspondiente *Minuta,* desglosó las instrucciones que se proponía impartir, entre las cuales destacamos, la instrucción número 3.26 (silencio de la persona acusada). De la referida *Minuta* también surge que, la defensa expresó no tener hasta el momento instrucciones específicas que solicitar.

En cumplimiento con lo ordenado, el Ministerio Público presentó por escrito su *Solicitud de Instrucciones al Jurado.* Específicamente, solicitó al TPI que impartiera las siguientes instrucciones: (1) 3.24 (actos de la persona acusada después del crimen o delito); (2) 4.13 (tentativa de asesinato a propósito y con conocimiento); (3) 5.1 (asesinato en primer grado a propósito o con conocimiento); (4) 13.6 (portación, transportación o uso de armas de fuego sin licencia); (5) que se impartiera una instrucción respecto al requisito de unanimidad en los veredictos, conforme a lo establecido en *Pueblo v. Torres Rivera II,* 204 DPR 288 (2020) y en *Ramos v. Louisiana,* 590 US 83 (2020).

---

[316] *Íd.*, págs. 973-998.
[317] *Íd.*, págs. 1187-1203.

El Ministerio Público sustentó la primera instrucción en que, de la prueba presuntamente surge que, cometidos los delitos, el apelante intentó huir cuando iba a ser puesto bajo arresto. En cuanto a la instrucción sobre portación, transporte o uso de armas de fuego, el Ministerio Público solicitó añadir, como ejemplos de elementos o circunstancias demostrativas de dicha posesión o portación, las personas heridas de bala, y los casquillos, plomos e impactos de proyectil.

Durante la vista celebrada el 8 de agosto de 2023, la defensa recibió una copia de las instrucciones especiales que a esos efectos instó el Ministerio Público. Además, verbalmente expuso que, no hay una instrucción especial que solicitar, adicional a la instrucción 3.23 (evidencia voluntariamente suprimida), refiriéndose al resultado toxicológico realizado al occiso, marcado como Identificación Núm. 17 del Pueblo, que no fue sometido en evidencia. Sostuvo, además, estar conforme con las instrucciones que indicó el foro primario el día anterior.

Luego de advertir a la defensa que debió informar y fundamentar por escrito su solicitud de instrucciones especiales, y de justipreciar los planteamientos de ambas partes, el foro primario denegó la procedencia de la instrucción 3.23 que solicitó la defensa. Consideró que, el informe toxicológico se marcó como identificación separada del protocolo de autopsia y que quien suscribió el referido informe no fue anunciado por el Ministerio Público como testigo.

Con respecto a las instrucciones que el Ministerio Público solicitó añadir, el TPI expresó que, la instrucción número 3.24 estaba entre las previamente anunciadas por el Tribunal. Denegó la instrucción 4.13 que solicitó el Ministerio Público, la cual sustituirá

por la 5.10.[318] Dispuso, además, que se proponía a ofrecer una instrucción sobre el requisito de unanimidad del veredicto.

Tras la presentación de los informes finales de ambas partes e impartidas las instrucciones, el jurado se retiró a deliberar. Finalizado lo anterior, el jurado emitió un veredicto de culpabilidad unánime en todos los cargos imputados. Luego de aceptar el veredicto y declarar culpable al acusado de un asesinato en primer grado, una tentativa de asesinato en primer grado, una portación y uso de un arma de fuego sin licencia, y dos convicciones por disparar o apuntar un arma de fuego, según tipificados en los Artículos 5.04 y 5.15 de la Ley de Armas, el TPI informó al jurado que había una solicitud de imposición de agravantes la cual requería de su votación.

En ausencia del jurado, el foro primario hizo constar que no correspondía la imposición de agravantes para el cargo de asesinato en primer grado y que los agravantes serían los siguientes: (1) se causó grave daño corporal a la víctima y su comisión revela crueldad; (2) se utilizó arma de fuego en la comisión del delito; y (3) el delito envolvió más de una víctima.

Luego de que ambas partes se acercaran al estrado y verificaran el sobre con las hojas de veredicto para los agravantes, el TPI les informó que entregará tales documentos al jurado, junto a la moción del Ministerio Público solicitando las acusaciones y los agravantes, con excepción del agravante correspondiente al asesinato en primer grado.

En presencia del jurado, el Ministerio Público y la defensa realizaron sus argumentaciones, a favor y en contra, de la imposición de los agravantes. Acto seguido, el TPI entregó al jurado las acusaciones, la moción solicitando la imposición de agravantes

---

[318] Cabe señalar que, la instrucción 4.13 que solicitó el Ministerio Público y que el TPI denegó para sustituirla por la 5.10, estaba entre las previamente anunciadas por el foro primario.

y las boletas. Los instruyó a deliberar y a votar si aprueban o no -de forma unánime- la imposición de agravantes, en cuyo caso, el foro primario lo considerará al dictar la sentencia. Finalizada la deliberación, el jurado rindió un veredicto unánime de culpabilidad en todos los cargos y autorizó la imposición de los agravantes.

El 10 de octubre de 2023, se celebró la vista para dictar sentencia. Según surge de la *Minuta* de la referida vista, la defensa argumentó que las circunstancias agravantes que la ley ya haya tomado en cuenta al tipificar el delito, como las que son inherentes al mismo, no debían ser consideradas en la fijación de la pena. Por su parte, el Ministerio Público replicó que, la base para aplicar la duplicidad, en cuanto a las violaciones a la Ley de Armas, es luego de aplicados los agravantes, no a partir de la pena fija.

El foro primario razonó que, los planteamientos esbozados se trajeron ante la consideración del jurado, previo a que este autorizara la imposición de los agravantes. Por consiguiente, el TPI dictó una *Sentencia* mediante la cual condenó al apelante a las siguientes penas:

- Artículo 93 (a) Código Penal- asesinato en primer grado: una pena fija de noventa y nueve (99) años, más seis (6) años por la reincidencia simple, para un total de ciento cinco (105) años.

- Tentativa Artículo 93 (a) Código Penal – tentativa de asesinato en primer grado: una pena fija de veinte (20) años, más cinco (5) años por reincidencia y otros cinco (5) años por agravantes, para un total de treinta (30) años de prisión.

- Artículo 5.15 Ley de Armas – disparar o apuntar armas (2 cargos): una pena fija de cinco (5) años, más un (1) año y tres (3) meses por la reincidencia simple, y otros tres (3) años y nueve (9) meses por los agravantes;

duplicados a veinte (20) años en cada cargo, por virtud del Artículo 7.03 de la Ley de Armas.[319]

- Artículo 5.04 Ley de Armas – portación y uso de armas de fuego sin licencia: una pena fija de diez (10) años, más dos (2) años y seis (6) meses por la reincidencia, a lo cual se añaden siete (7) años y seis (6) meses por los agravantes, para una suma de cuarenta (40) años de prisión.

Además, el foro primario declaró culpable al acusado por desacato, producto de lo cual, le impuso una pena de seis (6) meses de prisión, a ser cumplida de forma concurrente con las penas por asesinato en primer grado y su tentativa, y de forma consecutiva a las penas por los delitos bajo la Ley de Armas, para una suma global de ciento ochenta y cinco (185) años de prisión.[320]

Inconforme, el apelante acude antes nos mediante el presente recurso y señala la comisión de los siguientes errores:

A. Erró el Jurado al declarar culpable al señor Roberto Montalvo Irizarry a pesar de que la prueba de cargo no estableció su culpabilidad más allá de duda razonable en violación a los derechos a la presunción de inocencia y al debido proceso de ley.

B. Incidió el foro de instancia al denegar una solicitud para la disolución del [J]urado basada en que el Ministerio Público comentó el silencio del acusado y el derecho a no defenderse. Además, las instrucciones impartidas, cuatro días después del incidente, no fueron específicas ni completas por lo que no subsanaron el efecto perjudicial de las expresiones del Ministerio Público.

C. Incidió el foro de instancia al denegar una solicitud de la defensa para que no se llevara a la consideración del

---

[319] Cabe señalar que, originalmente, el foro primario informó que los agravantes por las dos (2) infracciones al Artículo 5.15 de la Ley de Armas conlleva una pena de cuatro (4) años y nueve (9) meses de prisión. No obstante, el 12 de octubre de 2023, el TPI llamó nuevamente el caso a los fines de corregir la sentencia impuesta por concepto de agravantes, a tres (3) años y nueve (9) meses. Véase, *Minuta* de la vista celebrada el 12 de octubre de 2023, autos originales del Caso Núm. JVI2019G0011, Tomo III, pág. 716.

[320] Sobre el desacato, surge de los autos originales que, el 9 de noviembre de 2020, el Programa de Servicios con Antelación al Juicio (PSAJ) presentó una *Moci[ó]n Informativa Urgente del PSAJ* en la cual expuso que, el señor Montalvo Irizarry, quien se encontraba bajo supervisión electrónica, por virtud de un recurso de *habeas corpus*, violentó las condiciones de excarcelación al manipular el sistema de supervisión electrónica. En igual fecha, el TPI celebró una conferencia con antelación a juicio a la cual el apelante no compareció, razón por la cual, el foro primario lo encontró incurso en desacato y emitió una orden de arresto. Véase, *Minuta* de la vista celebrada el 10 de noviembre de 2020, autos originales del Caso Núm. JVI2019G0011, Tomo I, pág. 194.

Jurado agravantes improcedentes en derecho, lo que vulneró los derechos del apelante al debido proceso de ley y a un juicio justo e imparcial.

D. Erró el Tribunal de Primera Instancia al momento de imponer y computar la sentencia en el caso de epígrafe, en contravención a los derechos a un juicio justo e imparcial y al debido proceso de ley.

Por su parte, el Pueblo de Puerto Rico, a través de la Oficina del Procurador General (recurrido), compareció ante nos mediante su correspondiente *Alegato,* instado el 7 de octubre de 2025. Con el beneficio de la comparecencia de ambas partes, de la transcripción de la prueba oral realizada por nuestra Secretaría y de los autos originales, procedemos a resolver el recurso ante nuestra consideración, no sin antes esbozar la normativa jurídica aplicable.

## II.

### A. Apreciación de la prueba y estándar de revisión judicial

La presunción de inocencia es de rango constitucional y se encuentra en el Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo I; *Pueblo v. Negrón Ramírez,* 213 DPR 895, 907 (2024). Toda persona acusada goza de la presunción de inocencia en los procesos criminales. *Íd.* Dicha presunción también forma parte de las Reglas 110 y 304 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110 y 304, y requiere que el Estado la derrote con prueba que establezca la culpabilidad del acusado más allá de duda razonable. *Pueblo v. Negrón Ramírez, supra,* citado además en *Pueblo v. Colón González,* 209 DPR 967, 977 (2022). Probar la culpabilidad más allá de duda razonable exige la presentación de prueba sobre los elementos del delito y la conexión de la persona acusada con el delito. *Íd.* Ante la existencia de duda razonable acerca de la culpabilidad del acusado, el juzgador de los hechos debe absolverlo. Regla 110 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 110; *Pueblo v. Santiago et al.,* 176 DPR 133, 142 (2009).

Lo anterior no significa que el Estado tenga que destruir toda duda posible, especulativa o imaginaria a los fines de probar la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez, supra*; *Pueblo v. Casillas, Torres,* 190 DPR 398, 414 (2014). El Estado debe presentar prueba suficiente que establezca en el juzgador de los hechos "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Negrón Ramírez,* supra, pág. 908.

Sabido es que, la Constitución del Estado Libre Asociado de Puerto Rico dispone el derecho a que el juicio se celebre ante un jurado, a toda persona acusada de delito grave. Art. II, Sec. 11, Const. ELA, *supra*; *Pueblo v. Negrón Ayala*, 171 DPR 406, 413 (2007). Ante tal esquema, le corresponde al jurado, como encomienda principal, ser el juzgador de los hechos. *Pueblo v. Negrón Ayala,* supra*; Pueblo v. Rosario*, 160 DPR 592, 603 (2003).

De manera que, es el jurado quien tiene la última palabra en cuanto a la culpabilidad o inocencia del imputado y será quien determine el delito específico, o el grado, por el cual este debe responder. *Íd.* Además, el jurado debe evaluar la evidencia presentada y admitida por el tribunal durante el juicio y llegar a las conclusiones de hechos correspondientes y aplicar el derecho, en atención a las instrucciones impartidas por el juez que presida el proceso. *Íd.* Es también el jurado el llamado a aquilatar la prueba desfilada y a decidir si le merece o no credibilidad. A base de ella, deberán rendir un veredicto. *Pueblo v. Lorio Ormsby I*, 137 DPR 722, 727 (1994).

Asimismo, la Regla 110 de las Reglas de Evidencia, *supra,* prescribe, en lo pertinente, lo siguiente:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
>
> [...]

(c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza.

(d) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.

[...]

(h) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Conforme a lo anterior, el testimonio de un solo testigo, que le merezca entera credibilidad al juzgador de los hechos, es prueba suficiente para demostrar la culpabilidad de un acusado, más allá de duda razonable y derrotar, así, la presunción de inocencia. *Pueblo v. de Jesús Mercado*, 188 DPR 467, 476 (2013), citando lo resuelto en *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). De igual forma, la prueba indirecta o circunstancial, es decir, aquella que se basa en una inferencia razonable, es tan suficiente como la prueba directa para probar cualquier hecho adjudicativo, incluso, en casos penales. *Pueblo v. Pagán, Ortiz*, 130 DPR 470 (1992).

En *Pueblo v. Cabán Torres*, 117 DPR 645, 656 (1986), el Alto Foro resolvió que, no existe un "testimonio perfecto". Este, de ordinario, en lugar de ser indicativo de veracidad, es altamente sospechoso porque, por lo general, es producto de la fabricación. *Íd.* Por tanto, evaluar un argumento sobre inconsistencias y contradicciones en la prueba testifical, plantea "una de las situaciones más delicadas, difíciles y angustiosas con las que se confrontan los componentes de un tribunal apelativo en su diaria labor". *Íd.* pág. 653. En ese sentido, los conflictos de un testimonio son dirimidos por el jurado o el juez del Tribunal de Primera Instancia, y solo procede alterar el valor, la credibilidad y la

determinación ante la demostración de circunstancias extraordinarias. *Pueblo v. Torres Rivera,* 137 DPR 630, 640 (1994).

Ante un planteamiento sobre insuficiencia de prueba, la función revisora apelativa "consiste en evaluar si la evidencia admitida cumplió con el estándar probatorio de establecer la culpabilidad del acusado más allá de duda razonable". *Pueblo v. Negrón Ramírez,* supra. Ahora bien, cuando el reclamo es atinente a la apreciación de la prueba, lo que se impugna es la valorización, la credibilidad o el aquilatamiento que el juzgador de los hechos adjudicó a la prueba desfilada durante el juicio. *Íd.*

Es norma reiterada que los tribunales apelativos no debemos intervenir, de ordinario, con la apreciación y la adjudicación de credibilidad realizada por el Tribunal de Primera Instancia, en relación con la prueba testifical. *Pueblo v. Hernández Doble,* 210 DPR 850, 864-865 (2022). En ausencia de una valoración apasionada, prejuiciada, parcializada o manifiestamente errónea, los foros apelativos debemos abstenernos de intervenir con la apreciación de la prueba y la credibilidad adjudicada por el juzgador de los hechos. *Pueblo v. Arlequín Vélez,* 204 DPR 117, 147 (2020). La apreciación de la prueba desfilada en un juicio criminal es un asunto combinado de hecho y derecho. *Íd.* Por tanto, la controversia en torno a si el Estado probó la culpabilidad del acusado más allá de duda razonable se puede revisar en apelación. *Íd,* citando a *Pueblo v. Cabán Torres,* supra. En su consecuencia, puede existir una excepción a la doctrina de abstención si, al analizar integralmente la prueba testifical, se produce en el ánimo del foro apelativo "una insatisfacción o intranquilidad de conciencia tal que se estremezca su sentido básico de justicia". *Pueblo v. Arlequín Vélez,* supra, pág. 148.

Como se sabe, la parte apelante es la llamada a señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán*

*Torres,* supra, pág. 654. De conformidad, el Tribunal Supremo de Puerto Rico ha resuelto que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesto; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Negrón Ramírez,* supra, págs. 912-913.

### B. Los delitos y los agravantes

#### i. El asesinato en primer grado y su tentativa

El Código Penal de 2012, en su Artículo 92, define el delito de asesinato como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente." 33 LPRA sec. 5141. Asimismo, el Código Penal de 2012 señala que una persona actúa *a propósito*, con relación a un resultado, "cuando su objetivo consciente es la producción de dicho resultado." 33 LPRA sec. 5035. A su vez, una persona actúa *con conocimiento*, con relación a un resultado, "cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta." *Íd.*

Cónsono con lo anterior, y a fin de exponer los grados de asesinato reconocidos, el Artículo 93 (a) del Código Penal de 2012, 33 LPRA sec. 5142, dispone que, constituye asesinato en primer grado: "(a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento."

Con relación a la tentativa, nuestro Código Penal de 2012 dispone que "[e]xiste tentativa cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad." 33 LPRA sec. 5048.

### ii. Los delitos bajo la Ley de Armas

Surge de la Exposición de Motivos de la Ley Núm. 404-2000, *supra*, que el propósito principal del estatuto fue lograr una solución efectiva al problema del control de armas de fuego en manos de delincuentes en Puerto Rico. *Cancio, Ex parte*, 161 DPR 479, 483-484 (2004). Esta legislación responde al interés apremiante del Gobierno de Puerto Rico de ser más efectivo en la lucha contra el crimen. *Íd.*; *Pueblo v. Rodríguez López et al.*, 210 DPR 752, 763 (2022). Por un lado, la Ley de Armas, *supra*, orienta a las personas autorizadas en Puerto Rico a manejar responsablemente sus armas de fuego. Por otro lado, apercibe sobre las serias consecuencias de incurrir en actos criminales utilizando armas de fuego. *Pueblo v. Concepción Guerra*, 194 DPR 291, 310 (2015). Por último, crea un sistema de registro electrónico, con el fin de facilitar la inscripción de todas las transacciones de armas de fuego y municiones que los concesionarios de licencias de armas realicen en Puerto Rico. *Íd.*

El Artículo 5.04 de la Ley de Armas, *supra*, tipifica como delito la portación de armas de fuego sin licencia o permiso para ello, y establece, en lo pertinente, que:

> Toda persona que transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
>
> [...]
>
> Se considerará como "agravante" cualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa.[...] 25 LPRA sec. 458c.

Con respecto a disparar un arma de fuego, el Artículo 5.15, 25 LPRA sec. 458n, de la referida ley dispone, en lo pertinente, que:

(A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:

(1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o

(2) [...] La pena de reclusión por la comisión de los delitos descritos en los incisos (1) y (2) anteriores, será por un término fijo de cinco (5) años.

De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año.

Disponiéndose que, aquella persona que cometa el delito descrito en el inciso (1) anterior, utilizando un arma de fuego y convicto que fuere, no tendrá derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. [...] 25 LPRA sec. 458n.

De conformidad, la Ley de Armas, *supra*, incluye un artículo sobre el agravamiento de las penas, en respuesta al interés apremiante del Estado de crear un disuasivo efectivo, con serias consecuencias, para el delincuente que incurra en actos criminales, mediante el uso de armas de fuego. En particular, el Artículo 7.03 de la entonces vigente Ley de Armas de 2000, 25 LPRA sec. 460b, indica que:

Toda persona que resulte convicta de alguna de las disposiciones de esta Ley, y que dicha convicción este asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de la Ley Núm. 4 de 23 de junio de 1971, según enmendada, conocida como la "Ley de Sustancias Controladas de Puerto Rico", con excepción del Artículo 4.04 de la misma, o de la Ley Núm. 33 de 13 de julio de 1978, según enmendada, conocida como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena dispuesta en esta Ley.

Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley o *usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará.* Toda violación a esta Ley en una zona escolar o universitaria según definida en el Artículo 1.02, conllevará el doble de la pena establecida.

Sobre el citado artículo, el Tribunal Supremo validó que "[l]as penas carcelarias dispuestas en la Ley de Armas se impondrán de forma consecutiva a cualquier otra sentencia", *Pueblo v. Bonilla Peña,* 183 DPR 335, 352 (2011). En lo atinente al momento en que habrá de aplicarse la referida duplicidad, el Alto Foro puntualizó que, "la pena que dicho precepto autoriza duplicar es la pena dispuesta para el delito imputado una vez considerados los posibles agravantes y atenuantes. Ahora bien, en ausencia de estos agravantes o atenuantes la duplicación se rige por la pena fija establecida." *Pueblo v. Concepción Guerra,* supra, págs. 313-314. (Énfasis suprimido.) Cabe puntualizar que, en *Pueblo v. Concepción Guerra,* supra, a la págs. 312-313, el Tribunal Supremo atendió un caso en el que el ahora convicto, Concepción Guerra fue acusado y sentenciado por violación a los Artículos 5.04 y 5.15, *supra* con sus correspondientes agravantes. Allí el Alto Foro determinó que, el foro primario actuó correctamente al aumentar, en presencia de agravantes, las penas fijas establecidas en ambos delitos y una vez aumentada, aplicar el agravante independiente del Artículo 7.03, *supra*, para duplicar las penas aumentadas previamente.

### iii. El agravamiento de las penas bajo el Código Penal

Sabido es que, el Artículo 67 del Código Penal, 33 LPRA sec. 5100, dispone sobre lo referente a la imposición de circunstancias agravantes y atenuantes en la fijación de las penas. Específicamente, el referido artículo dispone, en lo pertinente, lo siguiente:

> Excepto en delitos cuyo término de reclusión señalado en el tipo sea de noventa y nueve (99) años, el tribunal podrá tomar en consideración la existencia de circunstancias atenuantes y agravantes dispuestas en los Artículos 65 y 67 de este Código. En este caso, de mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un veinticinco (25) por ciento; de mediar circunstancias atenuantes podrá reducirse hasta en un veinticinco (25) por ciento de la pena fija establecida.
>
> [...]

> *Las circunstancias agravantes o atenuantes que la ley ya haya tenido en cuenta al tipificar el delito, al igual que las que son inherentes al mismo, no serán consideradas en la fijación de la pena.*

33 LPRA sec. 5100 (énfasis nuestro).

Nuestro Más Alto Foro judicial resolvió en *Pueblo v. Santana Vélez*, 177 DPR 61 (2009), la forma en que se impondrá una sentencia con agravantes cuando el juicio es por jurado. Analizada la jurisprudencia interpretativa, el Tribunal Supremo de Puerto Rico allí dispuso que, que, en los casos ante jurado, los agravantes de la pena deben ser sometidos ante el jurado y ser probados más allá de duda razonable, salvo que sean aceptados por el apelante. *Íd.*, citado, además, en *Pueblo v. Pagán Rojas et al.* 187 DPR 465 (2012).

Por otro lado, y pertinente al caso ante nos, el Artículo 66 del Código Penal, *supra*, establece que se consideran circunstancias agravantes a una pena los siguientes hechos relacionados con el convicto y con la comisión del delito:

> [...]
>
> (k) El convicto utilizó un arma de fuego en la comisión del delito o empleó algún instrumento, objeto, medio o método peligroso o dañino para la vida, integridad corporal o salud de la víctima.
>
> (l) El convicto causó grave daño corporal a la víctima o empleó amenaza de causárselo.
>
> [...]
>
> (o) El delito cometido fue de violencia y su comisión revela crueldad y desprecio contra la víctima. 33 LPRA sec. 5099.

Asimismo, la Regla 171 de Procedimiento Criminal, *supra*, dispone un listado de circunstancias agravantes similar al Código Penal y reza, en lo pertinente, como sigue:

> (b)Se podrán considerar como circunstancias agravantes, entre otras, las siguientes:
>
> (1) Hechos relacionados con la comisión del delito, con la víctima o con la persona del acusado, incluyendo entre otros:
>
> (A) El delito fue de violencia, se causó grave daño corporal, o amenaza de causarlo y se evidenciaron hechos que revelan una gran crueldad, ningún respeto humano y un rechazo a las normas de la decencia.
>
> (B) El acusado utilizó un arma en la comisión del delito.

[...]

(D) El delito envolvió más de una víctima. 34 LPRA Ap. II, R. 171.

### C. Instrucciones al Jurado

Sabido es que, la Constitución del Estado Libre Asociado de Puerto Rico, dispone el derecho a juicio por jurado de toda persona acusada de delito grave. Artículo II, Sección 11, Const. ELA, Tomo 1; *Pueblo v. Negrón Ayala*, 171 DPR 406 (2007). Igualmente, la Regla 111 de Procedimiento Criminal, *supra*, reconoce el derecho a ser juzgado por sus pares a todo acusado de delito grave e, inclusive, en ciertas circunstancias, al acusado de delito menos grave. *Íd.*; E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1992, Vol. II, pág. 273, reiterado en E.L. Chiesa Aponte, *Procedimiento Criminal y La Constitución Etapa Adjudicativa*, Ediciones SITUM, 2018, Vol. II, pág. 423.

Ante tal esquema, le corresponde al jurado, como encomienda principal, ser el juzgador de los hechos. *Pueblo v. Rosario*, 160 DPR 592 (2003). Es el jurado quien tiene la última palabra en cuanto a la culpabilidad o inocencia del imputado y será quien determine el delito específico, o el grado, por el cual este debe responder. *Íd.* Además, el jurado debe evaluar la evidencia presentada y admitida por el tribunal durante el juicio y llegar a las conclusiones de hechos correspondientes. Siguiendo las instrucciones impartidas por el juez que preside el proceso, el jurado debe aplicar el derecho para luego emitir un veredicto. Es también el jurado quien está llamado a aquilatar la prueba desfilada y decidir si le merece o no credibilidad. *Pueblo v. Lorio Ormsby I*, 137 DPR 722, 727 (1994).

Con respecto a las instrucciones al jurado, la Regla 137 de Procedimiento Criminal, *supra*, dispone lo siguiente:

> Terminados los informes, el tribunal deberá instruir al jurado haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del jurado. Por estipulación de las partes, hecha inmediatamente antes de empezar las instrucciones y aprobada por el tribunal, se podrá omitir hacer el resumen

de la evidencia. Todas las instrucciones serán verbales a menos que las partes consintieren a otra cosa. Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones, al terminar el desfile de la prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que éstas informen al jurado. Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular éstas fuera de la presencia del jurado. El tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o trasmitiendo cualquier instrucción adicional que estimare pertinente. Al terminar las instrucciones el tribunal nombrará al presidente del jurado y ordenará que el jurado se retire a deliberar. En sus deliberaciones y veredicto el jurado vendrá obligado a aceptar y aplicar la ley según la exponga el tribunal en sus instrucciones.

Es norma reiterada que, en nuestra jurisdicción, las instrucciones al jurado constituyen el mecanismo procesal mediante el cual los miembros del jurado toman conocimiento del derecho aplicable al caso. *Pueblo v. Rodríguez Vicente*, 173 DPR 292 (2008). En vista de que el jurado, de ordinario, está compuesto de personas desconocedoras de las normas jurídicas vigentes en nuestro ordenamiento jurídico, el juez que preside el proceso tiene el deber ineludible de instruir a los miembros del jurado sobre el derecho aplicable y de velar que las instrucciones impartidas sean correctas, precisas y lógicas. *Íd.*

### D. La disolución del Jurado

Finalmente, la Regla 144 de Procedimiento Criminal, *supra*, les permite a los tribunales ordenar la disolución del Jurado (*mistrial*) antes del veredicto en determinadas circunstancias. *Pueblo v. Robles González*, 125 DPR 750, 752 (1990). Una de esas situaciones es "[s]i se hubiere cometido algún error o se hubiere incurrido en alguna irregularidad durante el proceso que, a juicio del tribunal, le impidiere al jurado rendir un veredicto justo e imparcial." Regla 144(d) de Procedimiento Criminal, *supra*. El

Tribunal Supremo de Puerto Rico ha interpretado esta disposición reglamentaria y ha dicho que "no todo error o irregularidad en un proceso macula la imparcialidad de un veredicto. Tiene que ser grave, perjudicial, sustancial e insubsanable." *Pueblo v. Guzmán Camacho,* 116 DPR 34, 38 (1984).

En *Pueblo v. Rodríguez Santana,* 146 DPR 860, 881 (1998), el más Alto Foro judicial resolvió que el foro de instancia es quien está en mejor posición para adjudicar una solicitud de disolver un jurado y, de ordinario, merece la deferencia de los tribunales apelativos.

De otro lado, la Sección 11 del Artículo II de nuestra Constitución dispone que "nadie será obligado a incriminarse mediante su propio testimonio y *el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra.*" Artículo II, Sección 11, Const. ELA, LPRA, Tomo I (Énfasis nuestro). De conformidad con lo anterior, la Regla 501 de Evidencia, 32 LPRA Ap. VI, R. 501, establece que "una persona imputada o acusada tiene derecho, en una causa criminal en su contra, a no ser llamada como testigo, a no declarar y a que no sea hecha inferencia alguna del ejercicio de tal derecho." *Íd.*

Sobre lo anterior, en *Pueblo v. Calderón Álvarez,* 140 DPR 627, 636 (1996), nuestro Tribunal Supremo determinó lo siguiente:

> [C]omentar sobre el silencio del acusado equivale, a todos los fines prácticos, a traer a la mente del juzgador -por aquello de "el que calla otorga"- prueba similar al de una admisión de culpabilidad. Esto es, el propósito infame que persigue el "comentario al silencio del acusado" lo es el de convencer al juzgador de los hechos de que ese acusado -al no hablar, protestar o clamar por su inocencia, teniendo la oportunidad para hacerlo- "admitió", mediante su silencio, a ser responsable de los hechos que se le imputan.

Así, de surgir algún comentario sobre el silencio del acusado el juez deberá inmediatamente recriminarlo por conducta impropia e instruir al jurado en forma apropiada para evitar que el comentario de la fiscalía influya al jurado. *Pueblo v. Calderón Álvarez,* supra, citando además lo resuelto en *Pueblo v. Díaz,* 69 DPR 621, 629 (1949).

Ahora bien, el hecho de comentar sobre el silencio del acusado *no acarrea automáticamente la disolución del jurado ni la revocación automática de la convicción*. E. L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Tercer Mundo Editores, 1993, Vol. I, pág. 195. Véase, además, E.L. Chiesa Aponte, *Procedimiento Criminal y La Constitución Etapa Adjudicativa*, Ediciones SITUM, 2018, Vol. II, págs. 198-199.

Para determinar si el comentario da pie a que se decrete un "*mistrial*", se debe aquilatar la magnitud del comentario y las instrucciones que dé el Tribunal para subsanarlo, ya que el comentario pudo haber sido tan insignificante que sea suficiente una instrucción para subsanarlo. *Íd.*

**III.**

En síntesis, el apelante nos solicita que dejemos sin efecto el veredicto de culpabilidad que emitió el jurado, así como, la *Sentencia* dictada por el foro primario, ante la presunta comisión de cuatro errores relacionados a la apreciación de la prueba, a la presunción de inocencia del apelante, a su debido proceso de ley los cuales, a su entender, redundan en una sentencia ilegal y conllevan la disolución del jurado.

Por su parte, el Ministerio Público argumenta en su *Alegato* haber establecido la culpabilidad del apelante más allá de duda razonable; que el foro primario no erró en el cálculo de la condena ante la procedencia de imponer agravantes; y que no procede disolver al jurado tras el foro primario impartirles una instrucción sobre la presunción de inocencia del apelante y sobre su derecho a no auto-incriminarse.

Comenzaremos la discusión con el primer error señalado, atinente a la presunción de inocencia del apelante. El apelante señala que el Ministerio Público falló en probar los elementos de los delitos imputados y su conexión con el apelante, por lo que, a su

entender, el jurado erró al hallarlo culpable de los delitos imputados sin que se probara más allá de duda razonable su culpabilidad. Específicamente plantea que, el jurado incidió al hallarlo culpable, toda vez que, el Ministerio Público basó sus acusaciones en el testimonio del señor Marcucci quien, a su entender, resultó ser un testigo mendaz, que ofreció múltiples versiones contradictorias durante la investigación del caso. De igual forma aduce que, la investigación fue deficiente por no haberse corroborado las distintas versiones que brindó el señor Marcucci y porque la prueba científica no estableció la presencia del apelante en el lugar y momento en que ocurrieron los hechos.

Tras evaluar sosegadamente la totalidad del expediente, los autos originales y la transcripción de la prueba oral, constatamos que, el Ministerio Público presentó prueba suficiente para sustentar cada uno de los elementos de los delitos imputados y su conexión con el señor Montalvo Irizarry, a satisfacción del *quantum* de prueba más allá de duda razonable. Recordemos que esta no es una duda especulativa, imaginaria, ni cualquier duda posible, ni exige establecer la comisión del delito mediante certeza matemática. *Pueblo v. Negrón Ramírez,* supra. Basta con que se derrote la duda fundada en el raciocinio de todos los elementos de juicio implicados, sin necesidad de destruir toda duda posible. *Íd.*, pág. 908. En otras palabras, la insatisfacción de la conciencia del juzgador con la prueba presentada. *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

En este caso, el jurado tuvo el beneficio de evaluar la prueba directa que consistió en el testimonio de la víctima sobreviviente, el señor Marcucci, mediante el cual señaló al señor Montalvo Irizarry como el responsable de cometer los actos delictivos en su contra y describió cómo, dónde y cuándo los cometió. Ello, junto a los testimonios de los agentes que participaron en la investigación, de los civiles que tuvieron algún tipo de intervención con los hechos y

de la totalidad de la prueba admitida. Aquilatada la prueba, el jurado concluyó que el Ministerio Público estableció, más allá de duda razonable, que el apelante cometió todos los delitos imputados.

Reconocemos e identificamos ciertas inconsistencias en detalles de los hechos que ofreció el señor Marcucci, tales como, si este último conocía o no al señor Montalvo Irizarry; a través de cuál celular se comunicaron el señor Marcucci y el occiso con el apelante; y si el señor Marcucci conocía de armas de fuego. No obstante, las mencionadas discrepancias surgieron -dentro de la etapa investigativa-, no durante sus comparecencias ante el jurado. La admitida mendacidad del señor Marcucci en cuanto a que los $3,000.00 fueron producto de la venta de un vehículo de motor, cuando realmente fueron derivados de la venta de sustancias controladas, el testigo la explicó y, en todo caso, también incide sobre su credibilidad. Surge de la transcripción de la prueba oral que, el apelante tuvo la oportunidad de contrainterrogar al señor Marcucci sobre sus inconsistencias y su mendacidad, sin lograr minar su credibilidad ante el jurado. Al aquilatar el valor probatorio del testimonio del señor Marcucci, el jurado no apreció que lo antes resultara en una duda razonable que les impidiera encontrar culpable al señor Montalvo Irizarry.

Cabe puntualizar que, un testimonio perfecto, lejos de tener un indicio de veracidad, es sumamente sospechoso. *Pueblo v. Cabán Torres*, supra, pág. 656. En ese sentido, los conflictos de un testimonio son dirimidos por el jurado y solo procede alterar el valor, la credibilidad y la determinación del juzgador de hechos, ante circunstancias extraordinarias. *Pueblo v. Torres Rivera*, supra, pág. 640. Luego de un sosegado análisis del expediente y de la prueba desfilada ante el jurado, nos lleva a concluir su suficiencia para establecer los elementos del delito y para descartar que estamos ante tales circunstancias extraordinarias.

En su recurso, el apelante aduce que la investigación policial fue sumamente deficiente. Sustenta lo antes en que, la prueba científica impugnó la credibilidad del señor Marcucci, toda vez que, no ubica al señor Montalvo Irizarry en el vehículo en donde ocurrieron los hechos. Añade a lo anterior que, el registro de llamadas del celular del occiso pone en entredicho la versión del señor Marcucci de que el señor Montalvo Irizarry llamó al occiso poco antes de los hechos. Sin embargo, cualquier planteamiento sobre la presunta calidad de la investigación constituye un asunto que el jurado consideró, a través de la confrontación de la prueba realizada por la defensa. La ausencia de ADN del señor Montalvo Irizarry en la escena no descarta la presentación de prueba testifical y documental suficiente y creíble que establece lo contrario. Cualquier discrepancia en torno a través de cuál celular se comunicó el apelante antes de los hechos es un detalle propio de prueba corroborativa, sin constituir un elemento de los delitos imputados.

Evaluado lo antes, sostenemos que, en la etapa apelativa, dichas consideraciones no resultan suficientes para lograr que esta Curia se aparte de la norma de abstención de intervenir en la apreciación de la prueba en este caso. Lo determinante en el presente caso ha sido que el jurado le adjudicó un alto valor probatorio y credibilidad a la prueba desfilada. Además, el apelante no nos ha puesto en posición de determinar que haya mediado pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba admitida. Consecuentemente, no intervendremos con su criterio ni con su apreciación. El primer error no fue cometido.

Superado lo anterior corresponde atender los señalamientos de error sobre asuntos de derecho. En primer lugar, y según surge de la *Minuta* de la vista celebrada el 24 de marzo de 2022, en ausencia del jurado, la defensa hizo un planteamiento de derecho,

en solicitud de que se disolviera el jurado.[321] En particular plantea que, el TPI incidió al denegar su solicitud de disolver el jurado, a pesar de que, el Ministerio Público comentó indebidamente el derecho del apelante a guardar silencio, a no presentar prueba en su defensa, y a no defenderse durante el testimonio vertido por el Agente Meléndez Álvarez. Añade que, las instrucciones impartidas por el foro *a quo* no fueron lo suficientemente específicas y completas como para subsanar el efecto de las expresiones del Ministerio Público. No le asiste la razón.

Particularmente, el apelante señala como un comentario indebido, que atenta contra el derecho del apelante a guardar silencio y a no presentar prueba a su favor, cuando el Ministerio Público solicitó al TPI que tomara conocimiento judicial de que las notas que tomó el Agente Meléndez Álvarez -sobre las gestiones que realizó en la División de Robos con la Agente Itza Torres- fueron descubiertas[322] y cuando el Ministerio Público expuso que nada impedía que la defensa hubiera entrevistado a la Agente Itza Torres,[323] pregunta que la defensa objetó por sugestiva.[324]

Para un mejor contexto de lo acaecido en Sala, procedemos a citar, primeramente, el extracto del contrainterrogatorio hecho por la defensa, pertinente a la discusión de dicho señalamiento error:

> P.  Antes de ir al 20, no perdóneme, estamos todavía en el 19 de mayo, el 19 de mayo usted hizo otras gestiones, con otros compañeros policías, ¿correcto?
>
> R.  Correcto.
>
> P.  Que no son testigos en este caso, ¿correcto?
>
> R.  Correcto.
>
> P.  Las otras gestiones que usted hizo ese día 19 de mayo, usted las hizo con personas que no son testigos en este caso, ¿correcto?
>
> R.  Correcto.

---

[321] Véase, los autos originales del Caso Núm. JVI2019G0011, Tomo II, pág.372.
[322] TPO, pág. 458, líneas 1-12.
[323] *Íd.,* líneas 19-20.
[324] *Íd.,* línea 21.

P.    De esas gestiones que usted hizo, con otras personas que no son testigos en este caso, es que usted dice, que usted obtiene el nombre de mi representado el señor Roberto Luis Montalvo Irizarry.

R.    Correcto.

P.    No de ninguna persona testigo en este caso, ¿correcto?

R.    La información surgió.

P.    Me entendió la pregunta Agente, con mucho respeto.

R.    Esta [sic] bien, hágamela [sic] pregunta otra vez.[325]

[...]

P.    Que, con relación al nombre de mi representado, eso usted lo obtiene de personas que no son testigos en este caso, ¿correcto?

R.    Es correcto.

P.    Por el contrario lo estoy haciendo, pero en la opuesta, no de nadie que se ha sentado o que se vaya a sentar en este caso, que se haya sentado en la silla testifical o que se vaya a sentar en la silla testifical en este caso, ¿correcto?

R.    Si, correcto de otros Agentes.

P.    De otros Agentes que no son testigos en este caso.

R.    Correcto.

P.    Aquí hay testigos en este caso que usted ha apuntado nombres allí que se han sentado y que se van a sentar que por ejemplo, para entender con manejo de evidencia, que agarraron, si cogieron una pieza de evidencia y la entregaron a otra están ahí como testigo, ¿verdad? [P]ara poder declarar sobre eso, ¿correcto?

R.    Correcto.

P.    Y que se la entregó a otro y la guard[ó] en un cuarto.[326]

[...]

P.    Estábamos preguntando que con relación a este caso hay testigos hasta quien cogió algo y lo guard[ó] en un cuarto y lo tranc[ó], ¿verdad que sí?

R.    S[í].

P.    Para llegar al límite de los testigos que están en este caso, ¿verdad que sí?

R.    S[í].

P.    Y usted le quiere decir a las damas y caballeros del jurado que con relación a usted decirle a las damas y caballeros del jurado que usted cogió un nombre y continu[ó] con las gestiones, como usted coge ese nombre eso no lo están trayendo aquí, ¿verdad que no? Eso no lo van a escuchar[,] no va a hacer [sic] objeto de careo.[327]

---

[325] *Íd.,* pág. 415, líneas 12-28.
[326] TPO, pág. 416, líneas 10-26.
[327] *Íd.*, pág. 417, líneas 1-10.

[...]

P.      Que, con relación a una identificación a un nombre, esa prueba de esos testigos no se van a sentar ahí a decirle.[328]

[...]

P.      Que, con relación a un nombre de nuestro representado, el nombre de Roberto Luis Montalvo Irizarry, que con relación a ese nombre de donde, como, cuando surge, eso surge, no son personas, no es prueba que se vaya a presentarle a las damas y caballeros del jurado, ¿verdad que no?

R.      Lo investigu[é] yo.

P.      Si de la información usted hizo entrevistas y eso, las personas de las entrevistas de esa investigación que usted hizo, hemos hablado de sus entrevistas y las seguiremos, la investigación y la seguiremos discutiendo de su investigación de donde surge eso usted no se va a sentar aquí a decirle a las damas y caballeros del jurado, ¿verdad que no? La contestación es que no.[329]

[...]

R.      La contestación es que si yo estoy aquí.

P.      Que si alguien se va a sentar aquí.

R.      Bueno yo estoy sentado aquí explicando la manera.

P.      Usted ok, porque usted dijo a este tiene que ser Roberto Luis Montalvo Irizarry, ¿eso fue lo que usted hizo?

R.      La policía...

P.      Mire que, que, si eso fue lo que usted hizo, que está aquí sentado para declarar.

R.      Yo hice unas gestiones.

P.      Que, si eso fue lo que usted hizo Agentes, con mucho respeto, la pregunta me la entendió.

R.      No.

P.      Que si fue que usted hizo cuando usted está declarando en este punto que estamos, estamos cronológicamente, verdad en este punto que estamos de su investigación usted dijo ahhh este es Roberto Luis Montalvo Irizarry, ¿así fue que sucedió?

R.      No.

P.      Ok, usted no hizo esa identificación de ese nombre, ¿verdad que no? No fue usted que hizo esa identificación de ese nombre, ah con todo esto, ahh esas características, se parece a alguien que yo conozco, eso es Roberto Luis Montalvo Irizarry, eso no fue lo que usted hizo, ¿verdad que no?

R.      No, no.

P.      No, usted no dijo ah me mencionaron a un sospechoso de un carjacking, me mencionaron también envolverse a tiros con

---

[328] *Íd.*, líneas 15-16.
[329] TPO, pág. 417, líneas 20-30.

la policía a eso es Roberto Luis Montalvo Irizarry, eso tampoco fue lo que pasó, ¿verdad que no?

R.    No.

P.    En ningún momento, ni en ninguna escena ni en ningún ejemplo que le pueda dar usted va a decirle a las damas y caballeros del jurado que ese nombre fue producto suyo, que usted dijo ah, Roberto.

R.    No.

P.    No, ok. Nos dijo que esa prueba es una prueba que el ministerio público no le va a traer a las damas y caballeros del jurado, ¿verdad que no?

R.    No.

P.    No, o sea que a ellos no se le va a decir, ¿verdad que no? [P]orque usted es que tienen se nombre, ¿verdad que no?

R.    No.

P.    No, ni tampoco yo voy a poder en representación[,] verdad[,] de ese ciudadano[,] preguntarle, o lo que se llama carear esa prueba, confrontarla[,] hacer esto que estamos haciendo, verdad[,] preguntar para que ellos escuchen, yo no voy a poder hacer preguntas de eso, ¿verdad que no?

R.    No s[é].

P.    Para saber si le creemos[,] si no le creemos, si es cierto[,] si no es cierto.

[…]

R.    No s[é].[330]

Posterior a ello, el Ministerio Público tuvo la oportunidad de realizar el interrogatorio redirecto, de lo cual procedemos a citar el extracto pertinente:

P.    Con esa información ya le había dicho usted a la defensa que usted se dirigió.

[…]

P.    ¿Se dirigió a dónde?

R.    A la unidad de robos.

P.    ¿Con quién fue que usted habl[ó] allí?

R.    Con Itza Torres, la Agente Itza Torres.

P.    Itza Torres y esas gestiones que usted realiz[ó], [¿]d[ó]nde usted las anot[ó] de que habl[ó] con Itza Torres[?]

[…]

P.    Ok, en relación a la división de robos Itza Torres [sic], ¿dónde usted hizo constar eso?

---

[330] TPO, pág. 418, líneas 2-30; pág. 419, líneas 1-13 y 16.

R.      En las notas.

P.      En las notas suyas. Las mismas notas que usted compar[ó] ayer a petición de la defensa con la copia que ella tenía.

R.      Correcto.

P.      Le pregunto, pues solicitamos que se tome conocimiento judicial[,] su [S]eñoría[,] que el 22 de noviembre del 2019 fueron descubiertas.

[...]

P.      Agente, entonces respecto a Itza Torres que usted dice que aparece en las notas suyas, fue lo que dijo.

R.      S[í].

P.      Nada impedía que la defensa la hubiera entrevistado durante todo este tiempo.[331]

Tras objetar la pregunta por sugestiva,[332] la defensa planteó, en ausencia del jurado, que procedía su disolución porque las expresiones del Ministerio Público constituyeron un comentario indebido que atenta contra los derechos constitucionales del apelante. En su consecuencia, el foro primario se negó a disolver el jurado luego de considerar que, este asunto fue traído ante la consideración del jurado, cuando la defensa contrainterrogó al Agente Meléndez Álvarez.

En ese sentido, la transcripción de la prueba oral refleja las instrucciones impartidas por el foro *a quo*:

> Muchas gracias, pueden tomar asiento si así gustan. Antes de continuar con el desfile de prueba[,] el Tribunal quiere reiterar una instrucción que se le había dado previamente no obstante queremos en este momento repetirla y es en relación a la presunción de inocencia el derecho a no incriminaciones, peso de la prueba y duda razonable, bien. En nuestro sistema de justicia es un principio fundamental que la persona acusada se presume inocente hasta tanto el [M]inisterio [P]úblico, pruebe su culpabilidad más allá de duda razonable, la presunción de inocencia acompaña la persona acusada, desde el inicio del proceso, durante el juicio y continuar[á] durante la deliberación hasta que se rinda el veredicto. La persona acusada no tiene la obligación de testificar ni de presentar prueba para demostrar su inocencia, por lo que si no declara o no presenta prueba ustedes no harán inferencia alguna ni lo tomar[á]n en consideración, el peso de la prueba corresponde al ministerio público, es decir que este tiene que establecer todos los elementos del delito por el cual se acusa y su conexión con la persona acusada más allá de duda razonable.[333]

---

[331] *Íd.,* pág. 457, líneas 17-18 y 22-26; pág. 458, líneas 4-12 y 16-20.
[332] *Íd.,* pág. 458, línea 21.
[333] *Íd.,* pág. 460, líneas 26-30; pág. 461, líneas 1-11.

Nuevamente, y tras las partes presentar sus informes finales, el foro primario expresó al jurado lo siguiente, en cuanto al silencio del acusado:

> [e]n este caso, el acusado no testificó. Nuestra Constitución y [Q]uinta [E]nmienda de la [C]onstitución de Estados Unidos establece el derecho de un acusado a no declarar y que su silencio no puede tenerse en cuenta ni comentarse en su contra. Ustedes deben tener presente en sus deliberaciones que el acusado tiene el derecho a declarar o no hacerlo, según su deseo. También deben tener presente siempre que el hecho de no haber declarado no puede considerarse como un indicio a una aceptación de culpabilidad. Recuerden en todo momento, en sus deliberaciones, que a pesar de que el acusado no haya declarado, el [M]inisterio [P]úblico tiene la obligación de probar su culpabilidad más allá de duda razonable.[334]

Colegimos que, las expresiones del Ministerio Público no constituyeron un comentario claro y fehaciente sobre el silencio, sin embargo, de haberse entendido así, el foro primario impartió las instrucciones de rigor, para salvaguardar los derechos constitucionales del apelante y a los fines de subsanar cualquier posible efecto sobre la capacidad del jurado de rendir un veredicto justo e imparcial. Según reseñamos anteriormente, no toda irregularidad dentro del proceso criminal vicia la imparcialidad de un jurado. *Pueblo v. Guzmán Camacho,* supra, pág. 38. Tampoco acarrea la disolución del jurado, ni provoca la revocación de su veredicto, sin antes, aquilatar el comentario mismo y evaluar la suficiencia de la instrucción impartida para subsanarlo. E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Tercer Mundo Editores, 1993, Vol. I, pág. 195.

Sin duda, las instrucciones que el TPI impartió al jurado -sobre el silencio del apelante y sobre su presunción de inocencia- no fueron generales ni adolecieron de falta de especificidad, tal como aduce el apelante. Más bien, estamos ante unas instrucciones que fueron aceptadas por ambas partes, sin que la defensa solicitara al foro primario impartir instrucciones adicionales. Sobre tales bases,

---

[334] Transcripción de la prueba oral de la vista celebrada el 8 de agosto de 2023, pág. 90, líneas 13-23.

concluimos que, las instrucciones en cuestión subsanaron cualquier posible efecto perjudicial contra los derechos constitucionales del apelante. El segundo error no se cometió.

Finalmente, el señor Montalvo Irizarry señala como tercer y cuarto error, la imposición de agravantes y el cómputo de estos en la sentencia condenatoria. Por estar estrechamente relacionados entre sí, discutiremos ambos errores conjuntamente.

Surge del expediente que, el Ministerio Público presentó un pliego de agravantes para la consideración del foro primario, que lee:

> Que el Sr. Montalvo Irizarry cometió delitos de violencia, causó grave daño corporal y se evidenciaron hechos que revelan una gran crueldad, ningún respeto humano y un rechazo a las normas de la decencia, consistente en que ejecutó señor Sánchez Plaza e intentó matar al señor Marcucci Soto.
>
> El señor Montalvo Irizarry utilizó un arma de fuego para la comisión del delito de asesinato y tentativa de asesinato contra las víctimas, cometió delitos de violencia.
>
> Los delitos cometidos por el señor Montalvo Irizarry envolvieron más de una víctima consistente en que le dio muerte al ser humano señor Sánchez Plaza e intentó dar muerte al señor Marcucci Soto.
>
> Los hechos evidenciaron que el acusado actuó a propósito y con conocimiento al darle muerte a una de las víctimas e intentar ejecutar al otro.
>
> El delito cometido por el señor Montalvo Irizarry contra el señor Marcucci Soto se trata de una tentativa de asesinato, que conlleva una pena de reclusión por un término fijo de 20 años. (Citas omitidas.)[335]

Sin embargo, según el apelante, no procede la imposición de los referidos agravantes, por estos presuntamente constituir los elementos de los delitos por los cuales el señor Montalvo Irizarry resultó convicto. Previo a atender el pliego de agravantes, cabe señalar que, el foro primario determinó excluir del cargo de asesinato, la imposición de agravantes, por tratarse de un delito cuyo término de reclusión es de noventa y nueve (99) años, de

---

[335] Véase, el Pliego de Agravantes presentado por el Ministerio Público, el 6 de febrero de 2020, autos originales del Caso Núm. JVI2019G0011, Tomo I; Recurso de Apelación, pág. 29 y *Alegato de El Pueblo de Puerto Rico,* pág. 30.

conformidad con el Artículo 67 del Código Penal, *supra.* Tras evaluar los agravantes que solicitó el Ministerio Público, el TPI correctamente descartó, como cuestión de derecho, los últimos dos, y presentó ante el jurado únicamente los restantes.[336] Destacamos, además, que los agravantes presentados emanan de distintas disposiciones legales, a saber, del Código Penal, *supra,* de las Reglas de Procedimiento Criminal, *supra,* y de la Ley de Armas, *supra.*

En primer lugar, los elementos de la tentativa de asesinato en primer grado son los actos inequívocos que el señor Montalvo Irizarry realizó inmediatamente dirigidos a ocasionarle la muerte al señor Marcucci, un ser humano, sin que ocurriera dicha muerte por circunstancias ajenas a su voluntad. Como vemos, no surge como elemento de la tentativa de asesinato el haber causado un grave daño corporal a la víctima, ni haber cometido un delito que envuelve violencia o crueldad. La utilización de un arma de fuego tampoco es un elemento de la tentativa de asesinato en primer grado.

Cabe puntualizar que, la lista de circunstancias agravantes que establece el Artículo 66 del Código Penal, *supra,* es taxativa, sin requerir el cumplimiento de todas o de un número particular de agravantes para su aplicabilidad. De manera que, la utilización de un arma de fuego en la comisión de la tentativa de asesinato en primer grado es suficiente para que se configure la imposición de agravantes en contra del señor Montalvo Irizarry. A lo anterior se añade que, las heridas de bala en el hombro de las cuales fue objeto el señor Marcucci, según lo creyó el jurado, demuestra que sufrió un grave daño corporal. También fue víctima de crueldad tras recibir disparos del apelante mientras huía del lugar de los hechos. Consecuentemente, no erró el foro primario al permitir que se presentaran al jurado como agravantes de la tentativa de asesinato

---

[336] Transcripción de la prueba oral de la vista celebrada el 8 de agosto de 2023, pág. 117, líneas 4-18.

en primer grado, la utilización de un arma de fuego en la comisión del delito, haber causado un grave daño corporal a la víctima y que el delito cometido fue de violencia y crueldad.

El argumento de la defensa en cuanto a que hubo una sola víctima de tentativa de asesinato en primer grado no nos convence. Al evaluar este agravante, se considerará el número de víctimas que fue objeto de la totalidad de los hechos delictivos que involucran a la persona acusada, sin limitarlo al número de víctimas para cada delito. Debido a que fueron dos (2) las víctimas del evento delictivo que llevó a cabo el señor Montalvo Irizarry, se configura el referido agravante.

En relación con los agravantes impuestos a las violaciones de la Ley de Armas, *supra,* en *Pueblo v. Concepción Guerra,* supra, pág. 312, el Alto Foro interpretó la intención legislativa detrás de la duplicidad de las penas por la comisión de actos criminales mediante el uso de armas de fuego y, a esos efectos resolvió:

> La Ley de Armas de Puerto Rico, desde su redacción original, tipificó los delitos de los Arts. 5.04 y 5.15, *supra,* con sus correspondientes agravantes y atenuantes. A partir de ese momento, dicho cuerpo normativo sufrió enmiendas con la intención legislativa expresa de "penalizar severamente al delincuente". En aras de articular esta política pública, la Ley Núm. 137-2004 incorporó el Art. 7.03, *supra,* para añadir de manera específica que, en casos de reincidentes, entre otros, las penas pueden duplicarse. Lo anterior nos lleva a concluir que el legislador quiso imponer la penalidad que se provee en el Art. 7.03, *supra,* sobre cada delito individual, agravado o atenuado, pues estos estaban incluidos al momento de incorporarse el mencionado artículo mediante enmienda a la ley.

> El razonamiento del foro apelativo intermedio a los efectos de que el Art. 7.03, *supra,* permite únicamente duplicar las penas fijas establecidas para los distintos delitos tipificados, no tendría cabida en instancias donde la pena fija establecida fuese reducida por la presencia de atenuantes. En esa situación, aunque se pruebe algún atenuante de los delitos imputados, el foro sentenciador tendría que eliminar su efecto sobre la pena resultante, pues solo podría duplicar las penas fijas establecidas. Se anularían *de facto* los atenuantes, con la consecuencia de privar al acusado de su derecho estatutario a la reducción de la pena fija establecida por la existencia de atenuantes.

> En vista de lo anterior, *resolvemos que al amparo del Art. 7.03 de la Ley de Armas de Puerto Rico,* supra, *la pena que dicho precepto autoriza duplicar es la pena dispuesta para el delito imputado una vez considerados los posibles agravantes y atenuantes. Ahora bien, en ausencia de estos agravantes o*

*atenuantes la duplicación se rige por la pena fija establecida. Este dictamen es cónsono con la intención legislativa que precede la aprobación y posterior enmienda de la Ley de Armas.* (Énfasis en el original.)

De conformidad, en el presente caso, el apelante fue convicto unánimemente por un jurado y sentenciado por el foro primario por infringir los Artículos 5.04 y 5.15 de la Ley de Armas, *supra.* Según demostrado, dicha arma de fuego fue utilizada en la comisión del delito de asesinato en primer grado, en contra de Carlos Isaac Sánchez Plaza; y en la tentativa de asesinato en primer grado, en contra del señor Marcucci. Por consiguiente, procede la imposición de agravantes en cuanto a los citados Artículos 5.04 y 5.15. Una vez impuestos tales agravantes, procede aplicar la duplicidad de la pena que emana del Artículo 7.03 de la Ley de Armas, *supra,* sin que ello sea discrecional.

En vista de que actuó correctamente el foro primario al imponer los referidos agravantes, no procede intervenir con el cómputo de la sentencia condenatoria. El tercer y cuarto error no se cometieron.

**IV.**

Por los fundamentos que anteceden, se confirma la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones